[No. 61610-8. En Banc. April 13, 1995.]

THE STATE OF WASHINGTON, *Petitioner*, v. FORD POWELL, JR., *Respondent*.

*David R. Needy, Prosecuting Attorney, K. Garl Long, Chief Deputy,* and *Corbin T. Volluz, Deputy,* for petitioner.

*Michael Danko,* for respondent.

MADSEN, J. — Defendant Ford Powell, Jr. (Powell or Defendant) was convicted of the second degree murder of his wife, Carolyn (Carrie) Powell. At issue is whether the trial court erred in admitting certain evidence including prior assaults on Carrie by Powell under ER 404(b), 403, and 801.

### FACTS

On March 29, 1990, Carrie's body was found floating in Bowman's Bay of Puget Sound. An autopsy revealed that Carrie's death was caused by manual strangulation. It further determined that she died fairly soon after her last meal as very little food had passed from her stomach to her intestine. A sweatshirt given to Carrie the day before by her sister-in-law and skull fragments were collected near the Deception Pass Bridge. A tide expert determined that for Carrie's body to have reached Bowman's Bay at the time it was discovered, her body must have been thrown off the bridge between 1 a.m. and 2:30 a.m. on March 29, 1990.

Based on information provided by Carrie's friends and relatives, the police focused on her husband as a suspect. In

the early morning hours of March 30, a search warrant was obtained for the Powell residence. When the police attempted to reach Powell by calling and knocking before entering, he did not respond. The police then forced the door open. They found Powell in the bedroom, lying in bed and still wearing all his clothes. The police testified that Powell was read his rights, handcuffed, and taken out to the dining room. When told by the police that they were investigating his wife's disappearance, Powell pointed out a collection of pill bottles on the table, saying "[t]hese are her pills". Verbatim Report of Proceedings vol. 4, at 626. After a brief discussion inside, Powell was taken outside and talked with Detective Chris Andersen in the detective's car. Powell's descriptions of what happened the evening before in response to Detective Andersen's questions were inconsistent. The other detectives continued searching the house. They found Carrie's lightweight jacket in the closet, her sweatpants and bra in a pile at the end of the bed, her watch in the bathroom, her keys lying on the desk, the shoes that her family said she usually wore by the door, and her dog's leash lying on the bedroom floor. Carrie's dog was not around. The officers testified that with the exception of the papers piled on the table, the bed, and the dog leash, the house was very orderly and well kept. At the jail, the police discovered that Powell was wearing a ring on his pinkie finger that was later identified by Carrie's sister-in-law as a ring Carrie had received when her mother died and customarily wore.

On January 8, 1991, the Defendant was formally charged by information with second degree murder in violation of RCW 9A.32.050(1)(a). The information was later amended on July 1, 1991 to include a violation of RCW 9A.32.050(1)(b) as well.

Before trial, the Defendant made a motion in limine to exclude evidence of prior misconduct and hearsay statements. As part of this motion, the defense asked that the State list with specificity all evidence it intended to introduce regarding the alleged prior misconduct of the Defendant, the alleged statements of Carrie, and all the witnesses

who would be testifying as to these. In response, the State prepared a list of the proposed testimony of witnesses and attached the list to its Brief in Opposition. This list was divided into three sections as follows:

## I. EVENTS ACTUALLY WITNESSED

1. October of 1989 — Defendant assaulted victim . . .

A. Sheri Closson — Closson was present in the Powell's [sic] apartment on Fir St. when the defendant abruptly exploded and shoved the victim backward over a stool, sending the victim sprawling on the floor.

2. November 13, 1989 — Defendant assaults victim and Stephanie Goss

A. Stephanie Goss — Goss was taking a shower . . . .. She heard the victim scream, and Goss came quickly out of the shower to see what was the matter. She saw the victim lying on her back on the floor with one foot up on the table, as though she had just been pushed over it and fell down. The victim was still screaming and shaking. Defendant was standing over the victim. Goss said to the defendant, "You son of a bitch, you're going back to prison for this." The defendant then struck Goss on the mouth, splitting her lip open . . . ..

B. Diane Belgarde — Belgarde happened to drop by at the Powell's [sic] apartment on Fir Street immediately after the defendant's assault on the victim and on Stephanie. The house was in a shambles. . . . The victim . . . told Belgarde that the defendant had assaulted her and then Goss, and that it was caused by the fact that the defendant was trying to coerce the victim into selling her house in Seattle against her will.

3. December of 1989 — Aborted attempted [sic] at divorce by victim

A. Patrick McBride — The victim went to an attorney's office in order to get a divorce from the defendant. . . . McBride took the victim to the attorney's office.

B. Janice Rinsemith [sic] — The victim told Rinsemith that she had given [the attorney] a retainer for a divorce from the defendant.

C. Bill Nielsen — Was retained by the victim to get a divorce from the defendant, but the victim decided later to drop the case.

4. January 12, 1990 — Assault by defendant upon victim in Sedro Woolley

A. Holly Cowell — Witnessed the victim walking along a street in Sedro Woolley with defendant driving (the wrong way) beside her trying to get her to get back in the car. The two were arguing. Cowell stopped the car she was driving and gave victim a lift back to her house. The victim told Cowell that the defendant beat her. . . .

B. Carrie Crowell — Witnessed the same as Holly Cowell . . ..

C. Officer Bud Heitman — Responded to call from Cowell and Crowell. When he arrived at the Powell's [sic] residence, he saw the defendant and the victim walking out and down the sidewalk. He spoke to them, but they did not respond. The victim looked scared. The defendant kept looking away.

5. Afternoon of March 28, 1990 — The defendant got mad at the bank when he discovered the funds had been withdrawn from the joint account he had with the victim.

A. Linda Penneke — Penneke opened new account for the defendant on the afternoon of March 28, 1990.

B. Les Moller — An employee of the bank, Les Moller was present and recalls the defendant getting extremely upset when he discovered that the funds ($1,500 or so) from the joint account he had with the victim were missing, having been withdrawn the previous day.

## II. HEARSAY EVENTS WITH PHYSICAL CORROBORATION

1. July of 1989 — Defendant assaulted victim, leaving a silver dollar-size bruise on inside of arm.

[A.] Lee Hewitt — While defendant and victim were at Hewitt's house, Hewitt noticed a large, fresh bruise somewhat larger than a silver dollar on the inside of victim's upper arm. While in defendant's presence, victim explained the bruise by saying she just banged herself. But on the phone at a later date, she admitted to Hewitt that defendant had given her the bruise during one of their arguments.

2. August or September of 1989 — Defendant assaulted and tried to strangle victim

A. Pat McBride — Shortly after defendant and victim were married (7/5/89), victim came to stay with McBride because she needed a place to hide from defendant. Victim said defendant had tried to strangle her and that she was afraid of him. McBride saw a bruise about a quarter of an inch in size under the victim's jaw on the right side of her throat that the victim identified as coming from defendant's assault on her. . . .

B. Diane Belgarde — Victim called Belgarde and asked her to come get her out of the Fir St. Apartment. When Belgarde arrived, the place was a mess, as though a big fight in which things were thrown had occurred. Victim complained of a sore arm. Victim also told Belgarde that defendant had tried to strangle her and showed Belgarde multiply [sic] red marks on her neck. . . .

3. Early November of 1989 — Defendant gave victim a fat lip

A. Stephanie Goss — Goss walked into Powell's apartment on Fir Street at about 3:30 p.m., . . . .. The victim had a fat lip. The defendant's sister was telling the victim repeatedly, "That's

no reason to get a divorce." After the parents and sister left, the victim told Stephanie that the defendant had hit her and given her the fat lip because the victim wouldn't sign over the papers on the house in Seattle she owned. . . .

4. December of 1989 — Bruises in shape of handprints witnessed on victim's arms . . .

A. Janice Rinesmith — Rinesmith saw bruises on victim's upper arms, and felt that they looked like fingerprints as if someone had grabbed her. . . .

5. December of 1989 — Spot in back of victim's head . . .

A. Sharon Christenson — . . . the victim showed Christenson a bald spot on the back of her head about the size of a half-bit or silver dollar. The victim said that the defendant had ripped the hair out of her head.

B. Sheri Closson — The victim also showed Closson the bald spot on the back of her head and identified it as being caused by defendant.

6. December of 1989 — Defendant twisted victim's breasts, leaving bruises about the nipples.

A. Sheri Closson — While victim was changing into new sweatshirt at Sheri Closson's residence, Closson saw multiple bruises about the victim's nipples. The victim explained that the defendant had done that to her.

B. Sharon Christenson — The victim told Christenson that on occasion, the defendant would twist her nipples until the pain was unbearable and she would scream.

7. February 17, 1990 — Victim seen wearing heavy makeup to hide bruise on cheek.

[A.] Lee Hewitt—While attending the housewarming for the Powell's [sic], Hewitt noticed victim wearing heavier makeup than usual. Hewitt then observed beneath the make-up a dark area on the victim's cheek.

## III. EVENTS NOT WITNESSED: NO PHYSICAL CORROBORATION

1. December, 1989 — Defendant beat the victim, ripped off her blouse and bra, then threw her in a ditch

A. Patrick McBride — . . . the victim showed up at McBride's apartment and said she had been assaulted by the defendant while they were doing their paper route. The defendant had hit her and ripped her top off and tried to get her out of the car.

B. Les Christenson — The victim told Les about going to collect for the paper route with the defendant; that the victim dropped a flashlight in a ditch and broke it. This made the defendant angry and he beat up the victim, ripped off her blouse and bra and threw her in the ditch.

C. Sheri Closson — The victim did something that the defendant didn't like while doing the paper route and as a result, the

defendant smacked her across the mouth, ripped off her blouse and pushed her out of the car.

D. Cathi Closson — The victim told her that at one time, the defendant pushed the victim out of a car after he had hit her and slapped her around.

E. Keith Closson, Jr. — The victim told Sheri Closson, Keith Closson's wife, about this incident in Keith Closson's presence.

F. Sharon Christenson — The victim told Sharon Christenson about the time the defendant beat her, ripped off her blouse and th[r]ew her in a ditch.

2. Early March, 1990 — Unplugged Telephone Incident

A. Sheri Closson — Victim told Closson that she had an anxiety attack one day and that she called Dr. _____ in the emergency room and he told her to drink a large bottle of Sprite and he would call back in two hours to see how she was doing. The defendant left to get the Sprite, but came back with only a small size. Several hours passed. When victim was wondering why the doctor hadn't called back, she checked the phone and found that it had been unplugged from the wall socket. When relating this incident to Closson, the victim said jokingly, "God, is he trying to kill me?"

B. Barbara Earholm — Victim told Earholm about the victim's having called the emergency room . . . several weeks before her death and having heart palpitations all night long. The victim waited for the doctor to call her back, as he had told her he would, but she eventually found out that the phone had been unplugged from the wall.

C. Lee Hewitt — The victim told Hewitt that the victim had heart medicine for a heart problem she had. One evening, she was out of medication and suffered a recurrence of the heart problem. The victim was waiting for a call from her doctor in order to get her medication. The victim specifically told the defendant that she might die if she didn't get her medication. The doctor didn't call back. The next day, victim found the phone unplugged.

3. About March 20, 1990 — Victim and defendant have fight over X-rated movie that defendant had rented . . ..

A. Patricia L. Feay — Can testify to the transactions of the defendant's having rented the X-rated video twice.

B. Susan J. Crandall — Can also testify to the renting of the X-rated video to the defendant.

C. Sheri Closson — The victim called Closson . . . and told Closson that she had found a filthy video tape on the VCR. The defendant was in a groggy state at the time, lying on the couch with his pants undone. The victim was upset and mad and crying as she related this to Closson.

4. March 27, 1990 — The day before the death of the victim, she and the defendant had a fight that caused the victim to leave the residence in Sedro Woolley and spend the night at an apartment in Mt. Vernon.

A. Corrina Taylor — A resident of the Mt. Vernon apartments, she saw the victim there on the evening of March 27, 1990.

B. Sheri Closson — While at the Mt. Vernon apartment on the evening of March 27, 1990, the victim called Sheri Closson and told her that the victim and the defendant had had a fight and, as a result, the victim left the residence and was going to spend the night at the Mt. Vernon apartment.

C. David Goss — On March 27, 1990, the victim told Goss that she was going over to the apartment to get away from the defendant and his folks because she was sick of them.

5. Morning of March 28, 1990 — Victim was going to go to police . . ..

A. Sheri Closson — Victim went to Closson's house on the morning of March 28, 1990. Victim told Closson that she felt like going to the police and telling them everything.

6. March 28, 1990 — The defendant was "drinking, drugging and getting violent."

A. Michelle Madsen — The victim spoke with Madsen on the phone during the afternoon of March 28, 1990, and told Madsen that the defendant was out on his paper route at the time; also that the defendant was "drinking, drugging and getting violent."

Br. of Appellant app. 1; Br. of Resp't app. 1 (hereinafter Br. App.).

On July 9, 1991, the court went through each of the entries on the list. The defense objected to much of the proposed evidence on the grounds of ER 404(b), relevancy, prejudice, and hearsay. After lengthy consideration of each piece of the proposed evidence, the trial judge admitted Br. App. I(1), (2), (4)(A), (B), (5)(A), (B), II(2)(A), (B), and (3) on the basis of its relevance for motive, opportunity, or intent. The trial judge also admitted the testimony outlined in Br. App. III(4)(A), and (C), (5), and (6), saying that it was relevant and helped the jury understand "the movements of the parties" and "get an accurate picture of what happened surrounding the series of events". Verbatim Report of Proceedings, at 168. The trial judge disallowed Br. App. I(3)(B), (C),

(4)(C), II(1), (4), (5)(A), (B), (7), III(1)(A), (F), (2)(A), (C), and (3)(A), (C). With respect to Br. App. II(6)(A), (B), the judge said he was inclined not to admit this evidence, but if counsel were to prove to him at the time of trial that its probative value would outweigh its inflammatory nature, he could be persuaded the other way.[1] The judge reserved ruling on Br. App. I(3)(A) and the proposed statement by Cowell and Crowell that Carrie told them Powell beat her. On the latter, the judge said that defense counsel would need to provide case law to support the exclusion of that statement. Near the close of argument, he stated generally that all of his rulings were subject to revision at the time of trial in terms of both nature and extent.

On July 16, 1991, after trial had commenced, the judge and the attorneys discussed additional motions. After ruling that Br. App. I(3)(A) was admissible, the judge said:

> You want to be very cognizant of the fact that you are sort of treading on eggshells with the nature of some of the testimony. I expect both counsel to deal with the proffered testimony in accordance with the Court's previous rulings. If you do have any problems, bring them up and we'll take the jury out and deal with it.

Verbatim Report of Proceedings vol. 1, at 14. Trial then began.

With the exception of Sheri Closson (Closson),[2] the witnesses testified as proposed in accordance with the rulings of the trial judge. Beyond his motion in limine, defense counsel did not make any other ER 404(b) or hearsay objections to the testimony of Holly Cowell (Cowell),[3] Stephanie Goss (Stephanie), Diane Belgarde (Belgarde),[4] Patrick McBride (McBride), the bank witnesses, and the witnesses listed in Br. App. III(4), (6). As for Closson, defense counsel

---

[1] This evidence was not introduced at trial.

[2] At trial, Closson's first name was spelled Sherri.

[3] Cowell did not testify at trial

[4] At trial, her name was spelled Diana Balgaard. Verbatim Report of Proceedings vol. 2, at 241.

made no further ER 404(b) or hearsay objections to her testimony as it conformed to that proposed. However, defense counsel did object to other evidence offered by Closson, which was not part of the motion in limine, on the basis of speculation and hearsay. Closson testified that she called her daughter after she talked to Powell and said, "Something has happened to Carrie. I think she is dead. I think she is dead underneath the house". Verbatim Report of Proceedings vol. 2, at 92. The court overruled defense counsel's objection, finding that this testimony went to Closson's state of mind and impressions at the time. Following a sidebar discussion, Closson went on to testify that she told her daughter, "I think Ford killed Carrie". Verbatim Report of Proceedings vol. 2, at 93. Defense counsel did not object to that statement.

Trial lasted through July 23, 1991. On July 24, 1991, the jury found the Defendant guilty of second degree murder as charged in the information. The Defendant appealed.

Before the Court of Appeals, Powell argued that the trial court erroneously admitted evidence under ER 404(b), 403, and 803. In an unpublished opinion, the Court of Appeals reversed the conviction. *State v. Powell*, noted at 73 Wn. App. 1013 (1994), slip op. at 19. The court found that the evidentiary rulings were preserved for appeal because motions in limine are usually treated as standing objections and neither party here had attempted to persuade the trial court to change any of its pretrial rulings. *Powell*, slip op. at 6-8. The court also found that Closson's statement that "Ford killed Carrie" was preserved for review even though not objected to or discussed pretrial because defense counsel had objected to a similar statement of opinion by Closson. *Powell*, slip op. at 10. Next, the court said that the remaining contested evidence was erroneously admitted under ER 404(b) since intent and opportunity were not disputed issues and that evidence of prior quarrels and abuse did not show evidence of motive to kill but only showed Powell's propensity to become abusive when angered. *Powell*, slip op.

at 15-17. Finally, the court said that Carrie's statements to other witnesses were not justified as state of mind exceptions to hearsay. *Powell*, slip op. at 18-19.

We granted the State's petition for review.

## ANALYSIS

■ The first issue we must address is whether the evidence issues have been properly preserved for appeal. The State argues that none of the evidentiary issues raised by Powell were objected to at trial. It then cites the general rule that when no objection is made to the evidence at trial, an evidentiary error is not preserved for appeal. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). A different situation is presented, however, when, as here, evidentiary rulings are made pursuant to motions in limine. Because the purpose of a motion in limine is to avoid the requirement that counsel object to contested evidence when it is offered during trial, the losing party is deemed to have a standing objection where a judge has made a final ruling on the motion, "[u]nless the trial court indicates that further objections at trial are required when making its ruling". *State v. Koloske*, 100 Wn.2d 889, 895, 676 P.2d 456 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988), *adhered to on reh'g*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4th 989 (1989); *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 91, 549 P.2d 483 (1976); *see also State v. Kelly*, 102 Wn.2d 188, 193, 685 P.2d 564 (1984); *Garcia v. Providence Med. Ctr.*, 60 Wn. App. 635, 641, 806 P.2d 766, *review denied*, 117 Wn.2d 1015 (1991).

This court has explained the difference between final rulings and those that are only tentative or advisory:

> If the trial court has made a definite, final ruling, on the record, the parties should be entitled to rely on that ruling without again raising objections during trial. When the trial court refuses to rule, or makes only a tentative ruling subject to evidence developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial.

*Koloske*, at 896. "[W]hen a ruling on a motion in limine is tentative, any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling." *State v. Carlson*, 61 Wn. App. 865, 875, 812 P.2d 536 (1991).

The majority of the trial court's rulings in this case were final. While the trial court in this case did make comments to the effect that its rulings were subject to revision, the trial court did not indicate that any further objections would be necessary during trial. In fact, the judge's admonition at the beginning of trial regarding compliance with his rulings implies the opposite. Moreover, the majority of the judge's rulings were expressed in language that was neither tentative nor equivocal. The court ruled that the evidence of prior assaults and quarrels to be provided by Closson, Stephanie, Belgarde, McBride, Michelle, and David was admissible. The trial judge also said that the testimony of Cowell and Crowell was admissible. As final decisions, Powell had standing objections to all this evidence when it was later used at trial; further objection was not required to preserve error.

Conversely, the trial judge reserved his ruling with respect to Cowell's testimony concerning the statement Carrie made about Powell beating her, indicating that defense counsel needed to provide further support for exclusion. Therefore, the judge only made a tentative or advisory ruling and defense counsel was required to object again to preserve the error for appeal. Since counsel failed to do so, any error with respect to this statement is not appealable. Similarly, defense counsel was required to object to Closson's testimony that "Ford killed Carrie" since it was not discussed during the motion in limine nor at any other pretrial proceeding. Without citing any support, the Court of Appeals said that a prior objection to "similar opinion evidence" from Closson "was sufficient to alert the trial court and preserve the error for review". *Powell*, slip op. at 10. Its ruling is in error. Under ER 103, an objection must be made to preserve an evidentiary error for appeal. Defense counsel did not object to Closson's statement nor did he ask for

a continuing objection to that line of inquiry. Thus, only Closson's first statement that Carrie was dead under the house is preserved for appeal. However, the Court of Appeals should not have reached any issue regarding this portion of Closson's testimony because no issue was raised in Powell's briefs to the Court of Appeals. RAP 10.3(a), (g).

■■ That said, we turn to the question of whether the admission of prior misconduct evidence was error. First, it should be noted that we will not disturb a trial court's rulings on a motion in limine or the admissibility of evidence absent an abuse of the court's discretion. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 283, 840 P.2d 860 (1992); *State v. Dennison*, 115 Wn.2d 609, 628, 801 P.2d 193 (1990); *Fenimore*, at 91-92. When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 77, 684 P.2d 692 (1984).

## I

### ER 404(b)

■ Under ER 404(b) evidence of other crimes, wrongs, or acts is presumptively inadmissible to prove character and show action in conformity therewith. ER 404(b); *Carson v. Fine*, 123 Wn.2d 206, 221, 867 P.2d 610 (1994). However, when demonstrated, such evidence may be admissible for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident". ER 404(b); *see also State v. Goebel*, 36 Wn.2d 367, 369, 218 P.2d 300 (1950) (establishing exceptions). If admitted for other purposes, a trial court must identify that purpose and determine whether the evidence is relevant and necessary to prove an essential ingredient of the crime charged. *Dennison*, at 628; *State v. Saltarelli*, 98 Wn.2d 358, 362, 655 P.2d 697 (1982); *State v. Robtoy*, 98 Wn.2d 30, 42, 653 P.2d 284 (1982); *State v. Tharp*, 96 Wn.2d 591, 596, 637 P.2d 961 (1981); *State v. Dinges*, 48 Wn.2d

152, 154, 292 P.2d 361 (1956); *State v. Goebel*, 40 Wn.2d 18, 21, 240 P.2d 251 (1952); *see also* Robert H. Aronson, *Evidence in Washington* 404-10 (2d ed. 1994). Evidence is relevant and necessary if the purpose of admitting the evidence is of consequence to the action and makes the existence of the identified fact more probable. *Dennison*, at 628; *see also Saltarelli*, at 362-63.

Historically, courts have admitted evidence of prior misconduct in spousal murder trials. *See, e.g., State v. Americk*, 42 Wn.2d 504, 506-08, 256 P.2d 278 (1953) (prior beatings); *State v. Spangler*, 92 Wash. 636, 638, 159 P. 810 (1916) (prior quarrels); *State v. Lewis*, 80 Wash. 532, 534-35, 141 P. 1025 (1914) (prior assaults). However, the grounds on which evidence of this nature has been admitted is not clear in many cases dealing with the issue.

■ We therefore must decide whether a proper basis exists on which prior misconduct evidence may be admitted in this spousal murder trial. In so doing we consider bases mentioned by the trial court as well as other proper bases on which the trial court's admission of evidence may be sustained. *See State v. Markle*, 118 Wn.2d 424, 438, 823 P.2d 1101 (1992); *Pannell v. Thompson*, 91 Wn.2d 591, 603, 589 P.2d 1235 (1979).

A

Motive

■ Contrary to the conclusion reached by the Court of Appeals, motive goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act. In *Tharp*, this court defined motive as:

> Cause or reason that moves the will . . . An inducement, or that which leads or tempts the mind to indulge a criminal act.
>
> . . . the moving power which impels to action for a definite result . . . that which incites or stimulates a person to do an act.

*Tharp*, at 597 (quoting Black's Law Dictionary 1164 (4th ed.

1968)). The sixth edition of Black's reads substantially the same, distinguishing between motive and intent:

> "Motive" is said to be the moving course, the impulse, the desire that induces criminal action on part of the accused; it is distinguished from "intent" which is the purpose or design with which the act is done, the purpose to make the means adopted effective.

Black's Law Dictionary 1014 (6th ed. 1990).

██ A number of cases dealing with the admissibility of evidence of prior assaults and quarrels have found that "[e]vidence of previous quarrels and ill-feeling is admissible to show motive". *State v. Hoyer*, 105 Wash. 160, 163, 177 P. 683 (1919). Evidence of prior threats is also admissible to show motive or malice. *State v. Gates*, 28 Wash. 689, 697-98, 69 P. 385 (1902); *see generally Americk*; 1 Charles E. Torcia, *Wharton's Criminal Evidence* § 110, at 389-90 (14th ed. 1985). However, such evidence must also be of consequence to the action to justify its admission. Since establishing motive is often necessary when only circumstantial proof of guilt exists, prior misconduct evidence that demonstrates motive is of consequence to the action in a case such as this. *See* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 3.6, at 227 (2d ed. 1986).

Turning to the evidence here, we find that much of the testimony was properly admitted to show Powell's motive for the murder. The testimony of several witnesses (consistent with that proposed pretrial) established the hostile relationship between Powell and Carrie as a strong motive for the murder. McBride testified that Carrie came to his home to get away from Powell and that she was seeking a divorce. See Br. App. I(3)(A), II(2)(A). Belgarde testified about other assaults and said that Carrie asked to be picked up after one assault. See Br. App. I(2)(B), II(2)(B). Both McBride and Belgarde testified to previous fights that ended with Powell trying to strangle Carrie. See Br. App. II(2)(A), (B). Closson, Stephanie, and Cowell testified regarding other physical altercations between Powell and Carrie. See

Br. App. I(1)(A), I(2)(A), I(4)(A), II(3). Michelle, David, and Closson spoke of fights between Carrie and Powell right before her death. See Br. App. III(4)(B), (C), (5), (6). Other witnesses provided a potential financial motive for Powell. Stephanie and Belgarde testified to fights which erupted over Carrie's refusal to sell her Seattle residence. See Br. App. I(2)(B), II(3). Bank witnesses testified that on the day of the murder Powell was irate when he learned that Carrie had withdrawn money from their joint account. See Br. App. I(5).

## B
### Intent

ER 404(b) also specifies intent as another purpose for which prior misconduct evidence may be admitted. Black's defines intent as:

> Design, resolve, or determination with which [a] person acts. A state of mind in which a person seeks to accomplish a given result through a course of action. . . . A state of mind existing at the time a person commits an offense and may be shown by act, circumstances and inferences deducible therefrom.
>
> . . . .
>
> Intent and motive should not be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

(Citations omitted.) Black's Law Dictionary 810 (6th ed. 1990).

"It is undoubtedly the rule that evidence of quarrels between the victim and the defendant preceding a crime, and evidence of threats by the defendant, are probative upon the question of the defendant's intent . . .". *State v. Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980) (citing among others *Americk; State v. Guerzon*, 23 Wn.2d 242, 160 P.2d 603 (1945); *Spangler*; and *State v. Quinn*, 56 Wash. 295, 105 P. 818 (1909)). Evidence of previous disputes or quarrels between the accused and the deceased is generally admissible in murder cases, particularly where malice or premeditation is at issue. "Such evidence tends to show the relationship of the parties and their feelings one toward the other, and often bears directly upon the state of mind of the accused

with consequent bearing upon the question of malice and premeditation." (Citations omitted.) *State v. Davis*, 6 Wn.2d 696, 705, 108 P.2d 641 (1940).

█ However, to admit prior misconduct evidence, it must be necessary to prove a material issue. Therefore, prior misconduct evidence is only necessary to prove intent when intent is at issue or when proof of the doing of the charged act does not itself conclusively establish intent. *Saltarelli*, at 365-66; *see also* Aronson, at 404-13.0 to -13.1; 5 Karl B. Tegland, Wash. Prac., *Evidence* § 119, at 423-24 (1989); 1 Torcia § 183, at 781. Otherwise, the intent exception would swallow the rule. *See* 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice* § 5242 (1978); Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct To Prove Mens Rea: The Doctrines Which Threaten To Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 579-80 (1990); Eric D. Lansverk, Comment, *Admission of Evidence of Other Misconduct in Washington To Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1221-24 (1986). The Court of Appeals correctly found that the prior misconduct evidence was improperly admitted for intent in this case because intent was not a disputed issue. Further, none of the contested evidence in this case is necessary to prove intent. Proof of the act of manual strangulation as well as the other evidence presented in this case established an intent to kill. Thus, intent is implicit in the doing of the act. The trial court erred in admitting evidence on this basis.

## C

### Opportunity

█ The trial court relied on opportunity as a third basis for the admission of the evidence. Evidence is relevant to show opportunity when it demonstrates the ability of a defendant to do a wrong because of a favorable combination of circumstances, time, and place that serves to identify the

defendant. Wright & Graham § 5241; *Webster's Third New International Dictionary* 1583 (1986). None of the evidence regarding prior quarrels and assaults between Powell and Carrie was relevant to show opportunity. Thus, the trial court erred in admitting the contested evidence on this ground.

## D

### Res Gestae

 While not specifically referring to the res gestae rule, the trial court correctly found that certain evidence was necessary for the jury to understand the movements of Carrie and Powell which related to the murder in the hours before Carrie's death. Under the res gestae exception, evidence of other bad acts is admissible " '[t]o complete the story of the crime on trial by proving its immediate context of happenings near in time and place' ". *State v. Tharp*, 27 Wn. App. 198, 204, 616 P.2d 693 (1980) (quoting *McCormick's Evidence* § 190, at 448 (Edward W. Cleary gen. ed., 2d ed. 1972)), *aff'd*, 96 Wn.2d 591, 637 P.2d 961 (1981); *see also State v. Thompson*, 47 Wn. App. 1, 11-12, 733 P.2d 584, *review denied*, 108 Wn.2d 1014 (1987). Each act must be "a piece in the mosaic necessarily admitted in order that a complete picture be depicted for the jury". *Tharp*, 96 Wn.2d at 594.

Here, all the evidence regarding events or statements that were made involving either Carrie or Powell on March 27 or 28 (the last 2 days of Carrie's life) were relevant and necessary to establish that the hostilities between Powell and Carrie continued until her demise. This continued hostility was particularly significant in light of the absence of eyewitness testimony to the murder. The evidence admissible under the res gestae exception includes: the testimony of the bank witnesses regarding Powell's behavior at the bank the day that Carrie died (Br. App. I(5)); Closson and David's testimony regarding Carrie being at David's apartment the night before she died because of a fight with Powell (Br.

App. III(4)); Closson's testimony regarding what Carrie said and did on the morning of the day she died (Br. App. III(5)); and Michelle's testimony regarding what Carrie said that afternoon (Br. App. III(6)).

In sum, although the trial court erroneously relied on intent and opportunity as bases for admitting the challenged evidence, these errors do not require reversal. We will uphold a trial court's decision to admit evidence of prior misconduct under ER 404(b) if one of its cited bases is justified. *See Dennison*, at 628 (upholding the trial court's admission of ER 404(b) evidence because its cited basis was justified). Here, the trial court correctly relied on the motive and res gestae exceptions as bases for admission.

## II

### ER 403

 Besides being relevant and necessary to purposes other than proving character or propensity, a trial court must also determine on the record whether the danger of undue prejudice substantially outweighs the probative value of such evidence, in view of the other means of proof and other factors. ER 403; ER 404(b) cmt.; *see also Dennison*, at 628. When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists. *State v. Rice*, 48 Wn. App. 7, 13, 737 P.2d 726 (1987). " '[I]n doubtful cases the scale should be tipped in favor of the defendant and exclusion of the evidence.' " *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (quoting *State v. Bennett*, 36 Wn. App. 176, 180, 672 P.2d 772 (1983)). However, proper evidence will not be excluded because it may also tend to show that the defendant committed another crime unrelated to the one charged. *Dennison*, at 628; *State v. Boggs*, 80 Wn.2d 427, 433, 495 P.2d 321 (1972). The prejudicial nature of ER 404(b) evidence must be balanced by the court on the record. *Carson*, at 221; *Dennison*, at 628.

We conclude after looking at the record as a whole that the court did indeed weigh the prejudice of all the evidence admitted against its probative value in its decision to admit

the evidence. The trial court carefully sorted through the proposed testimony and excluded a substantial amount of evidence in an effort to balance out the overall prejudicial effect. In so doing, it appears that the judge excluded evidence which may have been admissible otherwise. Moreover, the evidence admitted was highly probative for motive and res gestae purposes and, as the judge observed, was less inflammatory than some of the evidence the court refused. In some instances, the court explicitly accepted or rejected the prejudice concerns raised by Powell. We therefore find that the trial court did not err in admitting any evidence on this basis.

## III

### Hearsay

In addition to admissibility under ER 404(b) and ER 403, we must also decide whether any of this evidence was impermissible hearsay under ER 802. To be admissible, hearsay evidence must come within an exception listed in ER 803.

██ First, we must determine what evidence in this case is hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). If a witness testifies on the basis of her or his own observation, that statement is not hearsay. 2 Charles E. Torcia, *Wharton's Criminal Evidence* § 257, at 128-29 (14th ed. 1986). The eyewitness testimony of Stephanie, Belgarde, McBride, and Closson regarding actual fights or marks on Carrie are therefore not hearsay. However, the statements of Belgarde, McBride, and Closson as to Carrie's explanation of other marks are hearsay. Likewise, the following is hearsay: Closson's testimony regarding Carrie's statement about going to the police; Closson and David's testimony that Carrie said she was going over to David's apartment to get away from Powell and his parents; and Michelle's testimony that Carrie said Powell was drinking, drugging, and being violent.

We must next decide if any of the hearsay testimony outlined above falls within an exception. As the Court of Appeals pointed out, the state of mind exception of ER 803(a)(3) does not justify admission of most of the evidence here. Under *Parr*, the state of mind exception of ER 803(a)(3) is generally only applicable in instances where the state of mind of the deceased is at issue, such as in cases where the defenses of accident or self-defense are interposed. *Parr*, at 103. Here, neither defense was raised. However, the state of mind exception does allow hearsay statements to prove that the declarant acted in accordance with statements of future intent. *State v. Terrovona*, 105 Wn.2d 632, 642, 716 P.2d 295 (1986). Thus, ER 803(a)(3) would encompass Carrie's statements to David and Closson regarding going to the apartment.

The excited utterance exception of ER 803(a)(2) would allow any hearsay statement made while still under the influence of an exciting or stressful event. Because Carrie made her statements to Belgarde, McBride, and Closson regarding the cause of her injuries while still under the stress from her quarrels with Powell, her statements to this effect fall within the exception.

On the other hand, Michelle's testimony regarding Carrie's description of Powell as drinking, drugging, and getting violent, and Closson's testimony that Carrie said she felt like going to the police, do not fall within any hearsay exception. First, as pointed out earlier, Carrie's state of mind is not at issue. Nor does Carrie's statement to Closson show conformity with intent to act as Carrie did not follow through on her expressed intent. Second, since Carrie had not seen Powell for several hours when she uttered these statements, any excitement was attenuated, if it existed at all. Lastly, these statements are not present sense impressions since Powell was not present when the statements were made. These two statements should not have been admitted.

■ ■ Next, we must consider whether these errors require reversal. Reversal is merited when an error, such as improperly admitting hearsay evidence, deprives the defendant of the right to confrontation, unless the error is harmless. *State v. Hieb*, 107 Wn.2d 97, 108, 727 P.2d 239 (1986); *see also State v. Benn*, 120 Wn.2d 631, 650, 845 P.2d 289 (quoting *United States v. Bagley*, 473 U.S. 667, 678, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985)), *cert. denied*, 114 S. Ct. 382 (1993). The prosecution bears the burden of showing that the error established by the defendant is harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 89 L.Ed. 2d 674, 106 S. Ct. 1431 (1986); *see also Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *Guloy*, at 425; 3A Charles A. Wright, *Federal Practice* § 855, at 325-35 (1982). An error is not harmless beyond a reasonable doubt where there is a reasonable probability that the outcome of the trial would have been different had the error not occurred.[5] *Benn*, at 649; *see also Chapman*, at 24. A reasonable probability exists when confidence in the outcome of the trial is undermined. *Benn*, at 649 (quoting *Bagley*). In weighing the effect of the error, we consider factors such as "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case". *Van Arsdall*, at 684.

---

[5]This test achieves the same result as the overwhelming untainted evidence test adopted in *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). The two only differ in focus. The first focuses on the overall effect of the error on the outcome and the second looks to whether other evidence sustains the outcome. As *Delaware v. Van Arsdall*, 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986) points out, the harmless error determination is one which requires the reviewing court to take both of these issues, as well as others, into account. *Van Arsdall*, at 684; *see also Guloy*, at 426 (describing the overwhelming untainted evidence test as a means to this end).

Here, the State presented persuasive circumstantial evidence which showed that Carrie did not leave her house alive. An autopsy identified manual strangulation as the cause of death and evidence of prior abuse and attempts at strangulation was properly admitted. Given the strength of this other evidence before the jury, the only reasonable verdict the jury could have returned was that of guilty. Moreover, Carrie's remark to Michelle was only a repetition of evidence which had been more forcefully presented by the two independent bank witnesses who said that on the day Carrie died Powell smelled of alcohol and was extremely irate. Nor do we see any harm in Carrie's statement regarding going to the police because it was so vague. Carrie did not explicitly mention Powell's name, her reason for going to the police, or what she would tell the police if she did go. Thus, the testimony was not of great importance.

Because we find that no evidentiary error occurred which would have materially affected the outcome at trial, we uphold the jury's verdict, reverse the Court of Appeals, and reinstate Powell's conviction.

DURHAM, C.J., UTTER, DOLLIVER, SMITH, GUY, and JOHNSON, JJ., and ANDERSON and BRACHTENBACH, JJ. Pro Tem., concur.