**FILED**
**NOVEMBER 17, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38131-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BENJAMIN GORDON SWOFFORD JR., | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Benjamin Swofford appeals after a jury convicted him of three counts of second degree assault. He primarily argues there was insufficient evidence to sustain his convictions for counts 1 and 2 (using a BB gun as a deadly weapon) and insufficient evidence to sustain his conviction for count 3 (accomplice to assault with car). We conclude there was insufficient evidence to sustain his conviction for count 2. We remand with instructions for the trial court to vacate the reversed conviction, for resentencing, and direct the trial court not to impose community custody supervision fees due to a recent statutory amendment.

FACTS

On January 25, 2020, Crystal Couture drove Thomas Reynolds to a convenience store so he could buy cigarettes; their three-month-old daughter was in the back seat. On the way out of the store, Mr. Reynolds was confronted by a group of people about a woman's purse that had gone missing at a gathering he had attended one year before. Mr. Reynolds recognized some of the people and told them they could resolve things later, as he was currently with his family. Ms. Couture could not hear the conversation because her window was rolled up because it was cold outside. Mr. Reynolds got into the back seat, behind Ms. Couture, and told her to "take off." Report of Proceedings (RP) (Mar. 23, 2021) at 135.

As Ms. Couture drove home, Mr. Reynolds noticed a car was following them. They decided not to return home, instead driving in a large loop and eventually heading back toward the convenience store. The car continued following. As Ms. Couture approached a residential intersection, she saw a minivan blocking her way. There was a man, later identified as Mr. Swofford, standing near the van, pointing what appeared to be a handgun at her. Ms. Couture was unable to reverse because of the car following her. She attempted to drive through an adjacent yard, but the minivan lurched forward,

striking her car and causing it to spin and stall. The car following Ms. Couture then drove away.

Mr. Swofford ran up to within 10 feet of the back passenger window, pointing the gun. Mr. Reynolds rolled down his window and put his hands up. Ms. Couture feared the gunman would shoot them all, including her daughter, and begged Mr. Reynolds to get out of the car. Although scared, he got out of the car to protect his daughter. After this, Ms. Couture was able to restart her car, drive away, and call 911.

Mr. Reynolds walked to about five feet from Mr. Swofford, showed him his empty wallet, and told him he had nothing to steal. The gunman appeared surprised, but then moved his aim to Mr. Reynolds. The woman who had been driving the minivan, later identified as Heather Labrie,[1] was yelling at the gunman. After pointing the gun at Mr. Reynolds for about 30 seconds, he walked to the minivan, and Ms. Labrie drove away.

The police located the minivan and detained Ms. Labrie and Mr. Swofford. Ms. Labrie told police that Mr. Swofford hid a gun under the center console of the minivan. Officers located the gun and discovered it was an air gun made to fire pellets or BBs.

---

[1] At trial, Mr. Reynolds testified that the woman whose purse had gone missing lived on the corner of the intersection where the assault took place and he believed Ms. Labrie was her sister.

3

The State charged Mr. Swofford with three counts of second degree assault with a

deadly weapon: count 1, for threatening Mr. Reynolds with the air gun; count 2, for

threatening Ms. Couture with the air gun; and count three, premised on accomplice

liability, for Ms. Labrie driving the minivan into Ms. Couture's car.

*Trial*

In addition to eliciting testimony to establish the facts as outlined above, the State

asked questions of Mr. Reynolds and a person who lived near the incident to establish a

link between Mr. Swofford and Ms. Labrie.

Mr. Reynolds testified about Ms. Labrie's actions while Mr. Swofford pointed the

gun at him: "[T]he girl behind me was just going off even though she hit us, you know?

She just had [an] issue. She's going off, going off. And I don't think he was saying

much." RP (Mar. 23, 2021) at 229. When asked if Ms. Labrie was still yelling at Mr.

Swofford when he turned and walked away from Mr. Reynolds, Mr. Reynolds answered:

"Oh, yeah . . . . I mean it was her show, you know what I mean? Not saying to stick up

for the dude at all, but . . . she was kind of calling the shots, so to speak." RP (Mar. 23,

2021) at 231.

Ronald Johnson, who lived near the incident, testified that he looked out his front

door after hearing a car crash. He saw Mr. Swofford pointing a gun at Ms. Couture's car

4

from about two feet away and at Mr. Reynolds as he exited the car. He recalled that Ms. Labrie "was yelling at [Mr. Swofford] to knock it off. So [Mr. Swofford] went back to the van . . . ." RP (Mar. 23, 2021) at 279.

The State also called two law enforcement witnesses to describe the gun used by Mr. Swofford. Officer Ryan Murphy testified that he located the gun in the minivan after it was impounded. The gun appeared to be an authentic SIG Sauer 1911 firearm, but when officers began to render the gun safe to enter into evidence, they discovered it was an air gun. There was a ball bearing, or BB, in the barrel of the gun when the police found it.

Detective Benjamin Green testified that he had researched the air gun on the manufacturer's website, and explained:

> There are over a dozen warnings in the manual, to include saying, "This is not a toy"; to be cautious that others may consider it to be a firearm; to include like the range is 250 yards; using eye protection; "It may cause injury or death," things like that, making it clear that—that on the website this is not a toy.

RP (Mar. 23, 2021) at 291. He testified that the muzzle velocity of the air gun was listed as 340 feet per second, the equivalent of 231 miles per hour.

He tested the air gun using the manufacturer-recommended carbon dioxide cartridge and steel BBs. He testified that officers had previously removed the carbon

5

dioxide cartridge from the gun before storing it in evidence. He noted that the cartridge in evidence was empty of carbon dioxide because the process of loading the cartridge pierces it, allowing the gas to escape from the cartridge once it has been removed from the gun.

He testified that once the air gun was loaded with carbon dioxide and BBs, he fired it into the ground to determine if it was operable. Once he determined that it was operable, he fired it at a metal plate from 25 yards away to determine if the gun could accurately hit a target. The BBs he fired hit the plate and removed surface paint where they had struck it. He also fired at a couple of clay pigeons and was able to break them.

The State did not ask Detective Green whether a BB fired from the air gun could penetrate or break a car windshield or window.

*Verdict and sentencing*

The jury found Mr. Swofford guilty on all three counts. The court sentenced him to concurrent sentences of 84 months and imposed 18 months of community custody. It discussed Mr. Swofford's other legal financial obligations (LFOs): "$500 Victim Assessment. I'm going to presume he's had the DNA[2] collected before, so I won't order

---

[2] Deoxyribonucleic acid.

6

that.  I'll make a finding of indigency.  And we'll say $5 a month, and we'll start that January 2nd of next year."  RP (Apr. 8, 2021) at 410.

The court did not alter the standard condition of community custody that Mr. Swofford pay his supervision fees.  In the section regarding LFOs, it included only the $500 victim assessment.  It struck the criminal filing fee, writing "waived by court finding indigency."  Clerk's Papers (CP) at 229.  It struck the DNA collection fee, writing "previously paid."  CP at 229.

Mr. Swofford timely appealed.

## ANALYSIS

### A.    SUFFICIENCY OF THE EVIDENCE

Mr. Swofford contends there was insufficient evidence to support his three convictions for second degree assault.  We mostly disagree.

In a challenge to the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt."  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  We draw all reasonable inferences in favor of the State and against the defendant.  *Id.*  "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  *Id.*

Mr. Swofford argues there was insufficient evidence that the air gun was used as a deadly weapon or that he was an accomplice to Ms. Labrie in her assault. We address each argument in turn.

### 1.     *Evidence that the air gun was a deadly weapon*

To convict Mr. Swofford of second degree assault, the jury had to find Mr. Swofford assaulted Mr. Reynolds and Ms. Couture "with a deadly weapon, to wit: Sig Sauer 911 CO[2] airgun." CP at 178-79.

A gun that fires BBs is not a deadly weapon per se because it is not a firearm. *State v. Taylor*, 97 Wn. App. 123, 126, 982 P.2d 687 (1999). Thus, whether the air gun met the definition of a deadly weapon was a question for the jury to decide. *Id.*

The jury was instructed that a deadly weapon is "any weapon, device, instrument, substance, or article including a vehicle, which under the circumstances in which it is used, attempted to be used, or threatened to be used is readily capable of causing death or substantial bodily harm." CP at 184; *see also* RCW 9A.04.110(6). Substantial bodily harm "means bodily injury that involves a temporary but substantial disfigurement, or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or that causes a fracture of any bodily part." CP at 185; *see also* RCW 9A.04.110(4)(b).

Mr. Swofford relies on *State v. Carlson*, 65 Wn. App. 153, 828 P.2d 30 (1992), *State v. Skenandore*, 99 Wn. App. 494, 994 P.2d 291 (2000), and *Taylor*, 97 Wn. App. 123, to argue that there was insufficient evidence he used the gun as a deadly weapon.

In *Carlson*, the defendant approached an acquaintance with what appeared to be a rifle, pointing it at his face. 65 Wn. App. at 154-55. The victim believed it was rifle but pushed the barrel of the gun away. *Id*. at 155. The defendant moved as if to strike the victim with the gun but then walked away. *Id.* The gun was not placed into evidence, but the defendant testified it was an inoperative and unloaded BB gun. *Id.* He was convicted of second degree assault with a deadly weapon. *Id.*

We reversed, finding the facts did not support a finding beyond a reasonable doubt that the gun was a deadly weapon. *Id.* at 161. We noted that the only testimony on whether the gun was readily capable of causing harm came from the defendant, who testified it was inoperable, and thus there was no substantial evidence the gun was readily capable of causing substantial bodily harm. *Id.*

In *Taylor*, the defendant assaulted three younger boys with a BB gun that resembled a .45-caliber Colt automatic pistol. 97 Wn. App. at 125. He pointed the gun at each of the boys, held it within one-half inch of one boy's head, and yelled threats to shoot them. *Id.* The three boys believed the BB gun was a firearm and they were about

9

to be shot.  *Id.*  The defendant was found guilty of three counts of second degree assault

after the court found he used the BB gun as a deadly weapon, noting that the gun was in

evidence and there appeared to be nothing wrong with it.  *Id.*

We rejected the defendant's challenge to the sufficiency of the evidence.  *Id.* at

129.  We distinguished *Carlson*, noting that the gun used in the instant case was in

evidence and the trial court expressly noted it appeared functional.  *Id.* at 127.[3]

In *Skenandore*, an inmate fashioned a spear from rolled-up writing paper, dental

floss, and a golf pencil.  99 Wn. App. at 496.  He assaulted a corrections officer with the

spear, striking him on the chest and upper arm when the officer passed the inmate

breakfast through a port in the cell door.  *Id.* at 496-97. The pencil left marks on the

officer's shirt and indented red marks on his skin, but it did not tear the shirt or the skin.

*Id.* at 497.  The inmate disassembled the spear and disposed of parts of it before officers

retrieved it.  *Id.*  He was convicted of second degree assault after the State argued the

---

[3] In *Taylor*, we disagreed with *Carlson*'s conclusion that the BB gun, to be a deadly weapon, must actually be capable of causing death or substantial bodily harm. 97 Wn. App. at 128.  We take this opportunity to disagree with *Taylor* and align ourselves with *Carlson*.  The statute unambiguously defines "deadly weapon" as one "capable of causing death or substantial bodily harm."  RCW 9A.04.110(6).  To its credit, the State does not rely on *Taylor* to assert an incorrect principle of law.

spear could have caused substantial bodily injury to the officer's eye. *Id*. at 497-98.

We reversed, finding there was insufficient evidence the spear was a deadly weapon. *Id.* at 498. We reasoned that while there might be circumstances where the spear could be used as a deadly weapon, they were not present in the case before us. *Id.* at 500. We noted the jury had not been able to inspect the weapon, there was no testimony about the spear's potential for harm if the inmate had struck the officer in the face, and the design of the cell door prevented the inmate from reaching the officer's face with the spear. *Id.* We therefore held that "no rational trier of fact could have found that [the inmate's] spear was readily capable of causing death or substantial bodily harm under the circumstances in which it was used." *Id.* at 501.

Mr. Swofford contends that because the carbon dioxide cartridge was empty when Detective Green tested the gun, there is insufficient evidence the gun was capable of firing. We disagree. The detective testified that installing the cartridge pierces it such that the gas would have escaped from the cartridge after it was removed from the gun. This supports the inference that the cartridge was filled with carbon dioxide when Mr. Swofford was using the gun and the gun was capable of propelling a BB toward Ms. Couture or Mr. Reynolds.

11

In addition, there is substantial evidence to sustain the jury's verdict that Mr. Swofford committed second degree assault against Mr. Reynolds. Mr. Swofford pointed the gun at Mr. Reynolds from two to five feet away. A rational jury could find that the weapon, if fired at Mr. Reynolds's face, could have readily caused the loss of his eye or caused a substantial impairment of his vision. We affirm Mr. Swofford's conviction on count 1.

But we agree there is not substantial evidence to sustain the jury's verdict that Mr. Swofford committed second degree assault against Ms. Couture. Ms. Couture's window was rolled up throughout the encounter. The State submitted no evidence of what a BB, even fired at close range, could do to a car windshield or window. Nor was there any evidence that the same force that could break a clay pigeon could break a car windshield or window. Clay pigeons are made to break when a small projectile hits them; car windows are made to *not* break when a small projectile hits them. The State's evidence required the jury to speculate, rather than use reasonable inferences. Evidence is insufficient to support a guilty verdict if mere speculation, rather than a reasonable inference, supports it. *State v. Hummel*, 196 Wn. App. 329, 357, 383 P.3d 592 (2016). We reverse Mr. Swofford's conviction on count 2.

### 2. *Evidence of accomplice liability*

To convict Mr. Swofford of being an accomplice to Ms. Labrie's assault with the minivan, the jury had to find Mr. Swofford "aid[ed] or agree[d] to aid another person in planning or committing the crime." CP at 190; *see also* RCW 9A.08.020(3)(a)(ii). To be convicted as an accomplice, a defendant "need not have specific knowledge of *every element* of the crime committed by the principal, provided he has general knowledge of that specific crime." *State v. Roberts*, 142 Wn.2d 471, 512, 14 P.3d 713 (2000) (alteration in original).

Mr. Swofford contends he was merely present at the scene of Ms. Labrie's assault, which is insufficient evidence that he aided her in committing the assault. We disagree. There is ample evidence that Mr. Swofford aided Ms. Labrie in planning or committing the crime. Mr. Swofford and Ms. Labrie acted in concert to stop Ms. Couture's car. Mr. Swofford was near the van when the incident started, and he left in the van when the incident ended.

Mr. Swofford also contends there is insufficient evidence he aided or agreed to aid Ms. Labrie in the commission of *the* crime, i.e., the crime of second degree assault. An accomplice charged with second degree assault "'must have known generally that he was facilitating an assault, even if only a simple, misdemeanor level assault, and need not

13

have known that the principal was going to use deadly force . . . .'" *State v. McChristian*, 158 Wn. App. 392, 401, 241 P.3d 468 (2010) (quoting *In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001)). Here, a rational jury could find that Mr. Swofford and Ms. Labrie acted together for one purpose: to stop Ms. Couture's car. Mr. Swofford pointed a gun at Ms. Couture, placing her in reasonable fear for her life, while Ms. Labrie used the minivan to block the road. Mr. Swofford knew that he was not only facilitating an assault, he was committing one. Under such circumstances, it is immaterial whether he knew that Ms. Labrie would use deadly force to accomplish their joint purpose. We conclude the State presented sufficient evidence to sustain the jury's guilty verdict on count 3.

### B. INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Swofford contends trial counsel was constitutionally ineffective for failing to object to testimonial hearsay. We disagree.

We review a claim of ineffective assistance of counsel de novo. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must meet the two-pronged *Strickland*[4] test and show (1) defense counsel's

---

[4] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

14

representation was deficient, and (2) the deficient representation prejudiced the defendant. *Id.* at 457-58. "If a defendant centers their claim of ineffective assistance of counsel on their attorney's failure to object, then 'the defendant must show that the objection would likely have succeeded.'" *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021) (quoting *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019)).

Mr. Swofford contends trial counsel's performance was deficient because he failed to object to hearsay from Mr. Reynolds and Mr. Johnson regarding Ms. Labrie's statements at the scene. However, none of the challenged statements were hearsay.

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). It can be an oral or written assertion or "nonverbal conduct of a person, if it is intended by the person as an assertion." ER 801(a)(2). Hearsay includes only factual assertions, not orders, commands, questions, or requests. *State v. Kelly*, 19 Wn. App. 2d 434, 449, 496 P.3d 1222 (2021), *review denied*, 199 Wn.2d 1002, 504 P.3d 827 (2022). Testimony about facts based on a witness's observations is not hearsay. *State v. Powell*, 126 Wn.2d 244, 265, 893 P.2d 615 (1995).

Mr. Swofford challenges two statements by Mr. Reynolds. The first is his testimony that Ms. Labrie was yelling and "was just going off even though she hit us . . . . She's going off, going off." RP (Mar. 23, 2021) at 229. The second is his testimony that

15

Ms. Labrie "was kind of calling the shots, so to speak." RP (Mar. 23, 2021) at 231. Mr. Swofford contends these statements were offered to prove the truth of the matter asserted, "that these individuals were accomplices or were working together." Br. of Appellant at 41. This argument misunderstands the definition of "hearsay." While Mr. Reynolds's statements may contain assertions of fact to that effect, they are in-court assertions of fact by him, not out-of-court assertions by Ms. Labrie. Mr. Reynold's testimony contains no assertions of fact made by Ms. Labrie. Instead, they are Mr. Reynolds's impressions of events based on his observations of Ms. Labrie's behavior. The statements are not hearsay. *Powell*, 126 Wn.2d at 265.

Mr. Swofford next challenges Mr. Johnson's testimony that Ms. Labrie was "yelling at [Mr. Swofford] to knock it off." RP (Mar. 23, 2021) at 279. Mr. Swofford contends that this statement was offered to prove "that [he] was doing something untoward." Br. of Appellant at 41. While this testimony contains an out-of-court statement by Ms. Labrie, it contains no factual assertion that Mr. Swofford was doing something untoward. Instead, it is an order or command from Ms. Labrie to Mr. Swofford, from which there is a possible inference that Ms. Labrie believed Mr. Swofford was doing something untoward. This, however, is not hearsay. *Kelly*, 19 Wn. App. 2d at 449.

Mr. Swofford cannot show that trial counsel's performance was deficient. If trial counsel had objected to any challenged testimony as hearsay, the objection would not have been successful because the testimony was not hearsay.[5] Because Mr. Swofford cannot meet the first prong of the *Strickland* test, we need not address the second. *Crow*, 8 Wn. App. 2d at 507. Mr. Swofford's ineffective assistance of counsel claim fails.

C.     IMPOSITION OF SUPERVISION FEES

Mr. Swofford contends the trial court improperly imposed discretionary supervision fees when he was indigent. We disagree with his argument, but it nevertheless is moot due to a recent statutory amendment.

Earlier this year, the legislature amended the community custody statute. *See* SECOND SUBSTITUTE H.B. 1818, 67th Leg., Reg. Sess. (Wash. 2022). The amendment has an effective date of July 1, 2022, and deletes former RCW 9.94A.703(2)(d) (2018). The former subsection required defendants to pay community custody supervision fees, unless waived by the trial court. This amendment will apply at resentencing. Because the amended statute no longer permits imposition of community custody supervision fees,

---

[5] Because the challenged statements contain no factual assertions by Ms. Labrie and they are therefore not hearsay, we do not address Mr. Swofford's argument that the statements were testimonial hearsay in violation of the confrontation clause of the Sixth Amendment to the United States Constitution.

17

those fees must not be imposed on remand.

Affirm in part, reverse in part, and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Siddoway, C.J.                                        Staab, J.