# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53398-7-II |
| Respondent, | |
| v. | |
| RYAN SCOTT ADAMS, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — A jury convicted Ryan Adams of murder in the second degree after he struck and killed Robert Lorenzo Diaz with a hatchet. Adams appeals his conviction based on three grounds. First, he argues that the trial court erred in refusing to either dismiss his case or exclude autopsy photographs that the State disclosed late due to prosecutorial mismanagement. Second, he argues that a witness gave improper and speculative opinion evidence, violating ER 602 and ER 701. Finally, he argues that when the trial court erroneously ruled that a foreign conviction was comparable to second degree assault, resulting in an incorrect offender score. We affirm Adams's conviction, but remand for resentencing.

## FACTS

Adams and his companion, Shannon Miosek, met in Florida before traveling to Washington. Once in Washington, Adams and Miosek stayed together and set up a campsite. During a trip to a nearby store, Adams and Miosek met a group of men in the parking lot who had been traveling in a van. Miosek decided to join the group as they traveled out of Washington.

One of the men, Diaz, accompanied Adams and Miosek to their campsite to help Miosek gather her belongings. At the campsite, the mood became tense. Adams picked up a hatchet. Adams and Diaz stood within a few feet of each other until Adams told Diaz not to stand on the side of him. Diaz attempted to move away, and Adams attacked him from behind with the hatchet. Adams struck Diaz repeatedly.

After Adams attacked Diaz, Adams and Miosek went to a nearby convenience store to call 911. Adams told Miosek that he wanted to tell police that they had found Diaz laying on the ground in their campsite. He requested Miosek cooperate with his attempt to deceive police.

While Adams and Miosek traveled to the store, Adams removed his bloodied clothing and a bloodied bandana, and hid it in a junk pile. At the store, Adams called 911 and spoke with police. When the police arrived, Miosek told them that Adams had attacked Diaz. The police found Diaz and had him transported to a hospital where he later died. The State charged Adams with murder in the first degree.

Two weeks before trial, the State disclosed 60 additional autopsy photographs that had not been previously provided to the defense. Of those 60, the State sought to admit 9 for trial. The trial court determined the delay in production constituted mismanagement. During a later hearing on whether to dismiss Adams's case under CrR 8.3(b) or exclude the evidence under CrR 4.7(h)(7)(i), the court determined that the delay had not prejudiced Adams because the photos depicted autopsy evidence that had previously been timely provided to the defense. Additionally, the court determined that the State's delay was unintentional.

During trial, Miosek testified about Diaz's murder. Adams objected when Miosek answered the State's question about whether Diaz had provoked Adams. Miosek answered that

there had been no fight between Diaz and Adams, and that Diaz had nothing to defend himself with. Adams objected on the basis that Miosek's answer was speculative.

Later in her testimony, Miosek described what occurred after the attack. She said that Adams was focused on "not getting into trouble." 4 Report of Proceedings (RP) at 745. Adams objected to the testimony, arguing it was speculative. Immediately afterward, Miosek clarified that Adams said he wanted to tell police that they had found Diaz at the campsite, and that he wanted Miosek to play along. Additionally, she testified that Adams made efforts to discard bloodied clothing and a bandana. The jury convicted Adams of the lesser crime of murder in the second degree.

At sentencing, the State sought to increase Adams's offender score based on a prior Oregon conviction. In 2015, Adams pleaded guilty in Oregon to one count of unlawful use of a weapon. His "petition to enter a guilty plea" identified that he was pleading guilty to "Count 2" in the indictment, which read, "The defendant, on or about July 2, 2015, in Marion County, Oregon, did unlawfully attempt to use unlawfully against Michael Grant Spencer a screwdriver, a dangerous weapon." Clerk's Papers (CP) at 213, 210. At the hearing to enter his plea, the judge asked Adams whether he "attempted to use against Michael Spencer a dangerous weapon." CP at 235. Adams answered "Yes." CP at 235.

The trial court here conducted a comparability analysis of Adams's Oregon conviction. The State conceded that Oregon's unlawful use of a weapon statute was not legally comparable to Washington's assault statutes and, therefore, the court should conduct only the factual prong of the analysis. In conducting the factual comparability analysis, the trial court looked at the verbatim report of proceedings from Adams's 2015 Oregon sentencing hearing and the charging documents. The trial court considered statements made by the prosecution that explained why Adams pleaded

guilty. The court also examined information on the injuries to the victim's face and head. In the Oregon proceeding, neither the prosecution's statements nor the injuries were proven beyond a reasonable doubt, and Adams did not admit to them.

The trial court then analyzed whether Adams's use of the screwdriver satisfied Washington's definition of a deadly weapon. The court examined "use" under Oregon's statute, and determined that, while not synonymous with use under Washington's assault in the second degree statute, they were close. In analyzing whether the screwdriver was a deadly weapon under RCW 9A.04.110(6), the trial court considered the circumstances of Adams's actual use. Adams did not admit or stipulate to facts about the circumstances of his use of the screwdriver. The court concluded that because the screwdriver was readily capable of causing death or substantial bodily harm, and Adams had used it on someone's face or head, the weapon satisfied the Washington statute. The court ultimately determined that Adams's conduct was factually comparable to Washington's assault in the second degree statute.

The State argued that Adams's offender score should be two because his Oregon conduct was comparable to Washington's assault in the second degree. The trial court sentenced Adams to 264 months of confinement followed by 36 months of community custody. Adams appeals his conviction and sentence.

## ANALYSIS

I.      DISMISSAL UNDER CrR 8.3(b) AND EXCLUDING EVIDENCE UNDER CrR 4.7(h)(7)(i)

Adams argues that the trial court erred by not dismissing his case under CrR 8.3(b) or excluding evidence disclosed just before trial under CrR 4.7(h)(7)(i). Adams also argues that the State's mismanagement improperly forced Adams to choose between prepared counsel and his speedy trial right. We disagree.

A.      Standard of Review

We review a trial court's CrR 8.3(b) and CrR 4.7(h)(7)(i) rulings for abuse of discretion. *State v. Michielli*, 132 Wn.2d 229, 240, 937 P.2d 587 (1997*)*; *State v. Brooks*, 149 Wn. App. 373, 384, 203 P.3d 397 (2009).  A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.  *Michielli*, 132 Wn.2d at 240; *Brooks*, 149 Wn. App. at 384.

B.      Legal Principles

Under CrR 8.3(b), a trial court may dismiss a case due to government misconduct.  CrR 8.3(b) states, "The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial.  The court shall set forth its reasons in a written order."

Before a trial court may dismiss charges under CrR 8.3(b), the defendant must show by "a preponderance of the evidence (1) 'arbitrary action or governmental misconduct' and (2) 'prejudice affecting the defendant's right to a fair trial.'"  *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *Michielli*, 132 Wn.2d at 239-40).  Governmental misconduct need not be evil or dishonest; simple mismanagement is sufficient.  *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993).  However, a defendant must show actual versus speculative prejudice to succeed under CrR 8.3(b).  *Rohrich*, 149 Wn.2d at 657-58.  Dismissal under CrR 8.3(b) is an extraordinary remedy.  *Id*. at 658.

A trial court may also exclude evidence under CrR 4.7(h)(7)(i) that was provided to a party in violation of Washington's discovery rules.  *Hutchinson*, 135 Wn.2d at 881.  CrR 4.7(h) states:

(7) *Sanctions*.

(i) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.

CrR 4.7(h)(7)(i) empowers a superior court to exclude evidence. *Hutchinson*, 135 Wn.2d at 881.

Discovery sanction decisions made under CrR 4.7 are within the trial court's sound discretion. *State v. Vance*, 184 Wn. App. 902, 911, 339 P.3d 245 (2014). Minor violations of discovery rules are appropriately remedied by producing the evidence and ensuring the nonviolating party has sufficient time to review. *Hutchinson*, 135 Wn.2d at 881. Like dismissal, exclusion is an extraordinary remedy. *Vance*, 184 Wn. App. at 911.

A trial court must weigh four factors to determine if exclusion of evidence is warranted: "'(1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the prosecution will be surprised or prejudiced by the witness's testimony; and (4) whether the violation was willful or in bad faith.'" *State v. Ruelas*, 7 Wn. App. 2d 887, 896, 436 P.3d 362 (2019) (quoting *Hutchinson*, 135 Wn.2d at 883).

C. Dismissal or Exclusion

Here, Adams argues that the State's mismanagement seriously prejudiced his defense, and therefore, dismissal or exclusion of the evidence was required. According to Adams, the trial court's refusal to provide one of his requested remedies required him to choose between his right to a prepared defense or his right to a speedy trial. We disagree.

Here, the trial court found that the State had mismanaged Adams's case. However, at a later hearing, the trial court found that the additional photos included information that had been timely provided to Adams. The court also found that the State had not intentionally delayed

6

production. Based on those findings, the court concluded that Adams was not prejudiced and, therefore, neither dismissal nor exclusion were necessary.

Adams fails to show how his defense was prejudiced by the delayed production. Under CrR 8.3(b), Adams bears the burden of showing by a preponderance of the evidence that his defense was prejudiced. *See Rohrich*, 149 Wn.2d at 654. Adams must show actual, not speculative, prejudice to succeed under CrR 8.3(b). *See Id.* at 658. Adams uses strong language in arguing that the production delay required him to seek a continuance so that he could prepare his defense. However, he fails to say how his defense was affected or why new photos that included information he had timely received required additional preparation time.

Adams also fails to show why exclusion of the evidence was necessary under CrR 4.7(h)(7)(i). Although the trial court did not go through the four factors from *Hutchinson*, the court did determine that the production delay did not prejudice Adams and that exclusion was therefore unnecessary.

Because Adams makes no showing of prejudice, we hold that the trial court did not abuse its discretion when it decided that neither dismissal nor exclusion were necessary.

## II. LAY WITNESS OPINION TESTIMONY

Adams argues that, over his objection, the trial court improperly admitted Miosek's speculative opinion testimony under ER 602 and 701. We disagree.

### A. Standard of Review

We review a trial court's admission of evidence for abuse of discretion. *State v. Pirtle*, 127 Wn.2d 628, 648, 904 P.2d 245 (1995). An abuse of discretion exists "[w]hen a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons." *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

7

B.      Legal Principles

Under ER 602 and ER 701, a lay witness may testify about matters they have personal knowledge of and the lay witness's testimony is limited to those opinions or inferences that are rationally based on the perception of the witness. *State v. Henson*, 11 Wn. App. 2d 97, 102, 451 P.3d 1127 (2019). ER 602 states,

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

ER 701 states,

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702.

Absent manifest constitutional error, a party may only appeal issues preserved in the superior court. *Henson*, 11 Wn. App. 2d at 102. "The appellant may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial." *Id*.

C.      Miosek's Testimony Properly Admitted

Adams objected to Miosek's testimony on the grounds that it was speculative. Adams now argues that Miosek's testimony that Diaz did not provoke Adams, along with her testimony about what occurred after the attack, was speculative and improper opinion testimony because it required her to speculate about Adams's mental state. However, when Adams objected to the testimony, he only argued it was speculative. Because he did not properly preserve his argument that Miosek's testimony was improper opinion evidence, he may not raise that issue on appeal. *See*

*Henson*, 11 Wn. App. 2d at 102. For this reason, we only analyze whether Miosek's testimony was speculative.

Miosek's testimony was not speculative. Miosek's testimony about whether Diaz provoked Adams and what occurred after the attack was based on her personal observation. Such testimony is expressly allowed under ER 602. Based on this record, the trial court's decision to allow Miosek's testimony was not manifestly unreasonable or based upon untenable grounds or reasons. We hold that the trial court did not abuse its discretion.

III.     ADAMS'S FOREIGN CONVICTION COMPARABILITY

Adams argues that the trial court improperly relied on information in the Oregon charging documents and plea colloquy when it considered the factual prong of its comparability analysis. We agree.

A.     Standard of Review

We review a trial court's sentencing calculations de novo. *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014).

B.     Legal Principles

Washington's Sentencing Reform Act of 1987 creates standard sentencing ranges calculated based on the crime's seriousness and the defendant's offender score. *Olsen*, 180 Wn.2d at 472; RCW 9.94A.530. A defendant's offender score may be increased based on an out of state, or foreign, conviction per RCW 9.94A.525(3). *Olsen*, 180 Wn.2d at 472. Under RCW 9.94A.525(3), a foreign conviction increases a defendant's offender score if the crime the defendant was convicted of is comparable to a Washington crime. *Id.*

To determine whether the foreign conviction is comparable, we conduct a two-part analysis. *Id*. at 472-73. Under the first prong, we analyze the legal elements of a foreign conviction and compare them to the comparable Washington crime. *Id*. If the foreign conviction is identical to or narrower than the Washington crime, and thus contains all the serious elements of the Washington statute, the foreign conviction is legally comparable and may be used to calculate the defendant's offender score. *Id*.

If, however, the elements are not comparable, we must conduct a factual prong analysis. Under the factual prong analysis, we determine whether the defendant's foreign conduct would have violated a comparable Washington statute. *Id*. at 473.

In conducting the factual prong analysis, we are limited to analyzing those facts admitted or stipulated to by the defendant or proved to a factfinder beyond a reasonable doubt. *Id*. at 473-74; 476. "'Facts or allegations contained in the record, if not directly related to the elements of the charged crime, may not have been sufficiently proven in the trial.'" *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005) (quoting *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998)). Only those facts that are essential elements of the crime are considered admitted by the defendant. *Lavery*, 154 Wn.2d at 255.

C.      Proved or Admitted Oregon Conduct

The Oregon crime of unlawful use of a weapon states:

(1) A person commits the crime of unlawful use of a weapon if the person:

(a) Attempts to use unlawfully against another, or carries or possesses with intent to use unlawfully against another, any dangerous or deadly weapon as defined in ORS 161.015.

OREGON REVISED STATUTE (ORS) § 166.220.

10

In Oregon, the term "use" in the unlawful use of weapon statute refers both to "employment of a weapon to inflict harm or injury and employment of a weapon to threaten immediate harm or injury." *State v. Ziska*, 355 Or. 799, 334 P.3d 964, 970 (2014).

Further, Oregon defines dangerous weapon and deadly weapon as follows:

(1) "Dangerous weapon" means any weapon, device, instrument, material or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury.

(2) "Deadly weapon" means any instrument, article or substance specifically designed for and presently capable of causing death or serious physical injury.

ORS § 161.015.

Here, Adams pleaded guilty to count 2, which read, "The defendant, on or about July 2, 2015, in Marion County, Oregon, did unlawfully attempt to use unlawfully against Michael Grant Spencer a screwdriver, a dangerous weapon." CP at 213, 210. Adams also answered "yes" when the Oregon trial court asked whether he "attempted to use against Michael Spencer a dangerous weapon." CP at 235. Thus, Adams only admitted to using a dangerous weapon against his victim.

D.       Factual Comparability to Washington's Assault in the Second Degree Statute

The Washington crime of second degree assault states:

(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree:

(a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or

. . . .

(c) Assaults another with a deadly weapon.

RCW 9A.36.021.

Washington defines a deadly weapon as:

(6) "Deadly weapon" means any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article, or substance, including a "vehicle" as defined in this section, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

RCW 9A.04.110.

When conducting the factual comparability analysis, a court may only consider those facts admitted to by the defendant that are essential elements of the crime. *See Lavery*, 154 Wn.2d at 255. Here, Adams admitted to little more than the essential elements of the Oregon crime. We cannot consider, and the trial court should not have considered, the injuries allegedly caused by Adams's use of the screwdriver or the statements the prosecutor made to the Oregon court; such facts were neither admitted, nor proved beyond a reasonable doubt. The trial court improperly considered them in its analysis.

To be factually comparable, Adams's admitted or proved Oregon conduct would have to fulfill the relevant elements of Washington's crime of second degree assault. Here, the State would have to show that Adams had either "(a) Intentionally assault[ed] another and thereby recklessly inflict[ed] substantial bodily harm;" or that he had "(c) Assault[ed] another with a deadly weapon." RCW 9A.36.021(1). The record does not contain evidence of injury, so Adams's conduct does not satisfy RCW 9A.36.021(1)(a). To satisfy subsection (c), we must determine whether the screwdriver qualifies as a deadly weapon under RCW 9A.04.110(6) based on the circumstances of its use.

Centered on the appeal record, and considering only those facts admitted by Adams, we hold that Adams's Oregon conduct is not factually comparable to Washington's second degree assault statute. The record lacks the circumstances of Adams's use of the screwdriver, and

12

therefore, we cannot classify it as a deadly weapon under RCW 9A.04.110(6). Because the screwdriver cannot be classified as a deadly weapon, Adams's conduct does not satisfy RCW 9A.36.021(1)(c).

Moreover, Adams's admission to "use" of a weapon in his 2015 Oregon plea does not establish comparability. The definition of "use" in Oregon's deadly weapon statute fails to establish sufficient circumstances of use that would qualify the conduct as a second degree assault in Washington. In Oregon, "use" refers both to "employment of a weapon to inflict harm or injury and employment of a weapon to threaten immediate harm or injury." *See Ziska*, 334 P.3d at 970. Neither satisfies the circumstances of use requirement of Washington's statute. Washington's deadly weapon statute states: "any other weapon, device, instrument, article, or substance, including a 'vehicle' as defined in this section, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, *is readily capable of causing death or substantial bodily harm*." RCW 9A.04.110(6) (emphasis added). Even Adams's admission to "use" of the weapon in Oregon, *i.e.* to inflict harm or injury or threaten immediate harm or injury, fails to satisfy the Washington requirement that the weapon be "readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). Adams's Oregon conduct is not factually comparable to Washington's second degree assault statute.

## CONCLUSION

The trial court did not abuse its discretion in making its evidentiary rulings. However, because the trial court erred when it ruled Adams's Oregon conduct was comparable to Washington's assault in the second degree statute, thereby erroneously increasing his offender score, we remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Worswick, J.

Lee, C.J.