IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83688-9-I |
| Respondent, | DIVISION ONE |
| v. | |
| ROBERT L. JAMES, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, C.J. — A court order prohibited Robert James from contacting Paula Hance. Following an August 2020 incident in which James hit Hance, the State brought charges for felony harassment and for felony violation of a no-contact order (FVNCO). As that case was pending, James, out on bail, broke into Hance's house. The State initiated a second case, charging James with residential burglary and two additional counts of FVNCO. Before trial, the State added two more FVNCO charges based on letters James sent and phone calls he made to Hance while in jail. The trial court granted the State's motion to join the cases and the jury returned a guilty verdict on residential burglary and four counts of FVNCO but acquitted James of one of the FVNCO charges.

On appeal, James asserts that joinder was improper because the prejudicial effect of joinder far outweighed concerns of judicial economy. He also contends that the court erred in denying two of his for cause challenges and by not sua sponte dismissing four other jurors who James claims exhibited bias. We disagree and affirm.

FACTS

Robert James and Paula Hance dated on and off for several years. In 2018, James pleaded guilty to witness tampering, two counts of violating a no-contact order, and fourth degree assault—all charges involving Hance. At sentencing, the court imposed a five-year no-contact order protecting Hance. In 2019, James violated the newly imposed no-contact order. At sentencing on that violation, the court imposed a second, two-year no-contact order.

James and Hance continued their relationship despite the no-contact orders. Then, in August 2020, James became angry when Hance did not want to continue previously consensual sexual activity. James repeatedly slapped Hance and threatened that he "ought to kill [her] now." Hance fled the apartment in her bathrobe and sought help from a neighbor, who called 911. When police arrived, they found James down the street and arrested him.

James was taken into custody and charged with felony violation of a no-contact order and felony harassment. While in jail, James made over 100 phone calls to Hance, in further violation of the existing no-contact orders. He also mailed letters to Hance's neighbor. The letters were addressed to "Jamie Wanda Murphy" and "Wanda P. Murphy." At trial, the neighbor identified "Wanda" and "Murphy" as Hance's cats and testified that she believed the letters were meant for Hance because "cats don't know how to read." The neighbor also testified that she offered the letters to Hance, but Hance refused to take them. These letters and calls resulted in additional FVNCO charges.

2

James remained in custody until December 30, 2020, when he posted bond. After he was released from custody, he went back to living with Hance, despite the no-contact orders and his pending charges.

In May 2021, Hance's brother, Roy, spotted James and Hance leaving Hance's residence together. He took a video of the two with his cellphone and called the police. A few days later, after Hance told James that she didn't want to be with him anymore, she woke up to James breaking into her house. Hance fled and called 911 to report that James had broken into her house. Police responded to the scene and found James inside Hance's apartment, sitting on her bed. He was taken into custody and charged under a new cause number with residential burglary and with two counts of violating a no-contact order.

At trial, the State moved to join all pending charges against James.[1] The court granted the State's motion and the State filed an amended information charging James with residential burglary, felony harassment, and five counts of felony violation of a no-contact order.

After the State rested its case, the court dismissed the felony harassment charge for insufficient evidence. The jury then convicted James of residential burglary and four counts of felony violation of a no-contact order but acquitted him of the no-contact order violation based on Roy Hance's video observation. James appeals.

---

[1] The first FVNCO stems from James's August 2020 arrest. The next two relate to his communications with Hance while in jail. The fourth is the result of Roy Hance's video recording before James's May 2021 arrest, and the fifth is from when police discovered James in Hance's house.

ANALYSIS

James raises three issues on appeal. First, whether the trial court abused its discretion in joining two pending cases against James for trial. We conclude it did not. James does not explain how joinder was so manifestly prejudicial so as to outweigh concerns of judicial economy. Second, whether the court erred by not dismissing two jurors for cause or by not sua sponte dismissing four other jurors whom James claims exhibited bias. Because James failed to use all his peremptory challenges, he is precluded from challenging the first two jurors on appeal, and we conclude that the court did not err in not dismissing the other four jurors because they did not demonstrate probable bias. Lastly, whether the letters James wrote to Hance (nominally addressed to her cats) constitute sufficient evidence to support a FVNCO conviction. We conclude that they do. That James intentionally tried to contact Hance via the mail, even indirectly, is sufficient evidence to sustain the conviction.

Joinder

James contends the court erred in granting the State's motion to join the 2021 and 2020 cases because they involved separate events and were supported by evidence of disparate strength, which might lead the jury to conflate the two cases' persuasiveness. We disagree.

We review a trial court's decision on a pretrial motion for joinder for abuse of discretion. State v. Bluford, 188 Wn.2d 298, 305, 393 P.3d 1219 (2017). A trial court abuses its discretion when its decision is unreasonable or based on

untenable grounds or reasons.  State v. Powell, 126 Wn.2d 244, 258, 893 P.3d 615 (1995).

CrR 4.3(a) permits joinder of charges where the offenses are of the same or similar character, are based on the same conduct, or are part of a single scheme or plan.  Joint trials are generally preferred over separate trials and we construe the joinder rule expansively to promote judicial economy.  State v. Dent, 123 Wn.2d 467, 484, 869 P.2d 392 (1994); State v. Bryant, 89 Wn. App. 857, 867, 950 P.2d 1004 (1998).  But joinder is inappropriate "if it will clearly cause undue prejudice to the defendant."  Bluford, 188 Wn.2d at 307.

A defendant contesting joinder must show that a joint trial " 'would be so manifestly prejudicial as to outweigh the concern for judicial economy.' "  State v. Wood, 19 Wn. App. 2d 743, 764, 498 P.3d 968 (2021) (quoting State v. Bythrow, 114 Wn.2d 713, 718, 790 P.2d 154 (1990)).  "There are four factors to consider when determining whether joinder causes undue prejudice: '(1) the strength of the State's evidence on each count; (2) the clarity of defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of evidence of the other charges even if not joined for trial.' "  Bluford, 188 Wn.2d at 311-12 (quoting State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994)).  After considering these four factors, the court then must weigh the prejudice to the defendant against benefits to judicial economy.  Wood, 19 Wn. App. 2d at 765.

1. Strength of the State's Evidence

James asserts that the State has strong evidence as to the 2021 case but weak evidence as to the 2020 case for several reasons. First, he claims that the 2021 case is stronger because police witnessed one of the violations firsthand, while establishing the charges in the 2020 case will require civilian witness testimony. Next, he contends that only the 911 call in the 2021 case is admissible as a hearsay exception and that the 911 call in the 2020 case is inadmissible as double hearsay because the neighbor—not Hance—called the police. Finally, he notes that in the 2021 case Hance gave a recorded statement to police and that no such statement was made in the 2020 case. The State counters that because there was an independent witness for each incident, the strength of the evidence is similar. We agree.

James cites no authority for his assertion that civilian witness testimony is weaker evidence than police testimony. And here, the jury received a standard instruction that they alone could judge the credibility of testimony.[2] Regardless of the type of witness, each incident involved an eyewitness capable of testifying about the events that transpired. In the 2021 case, police found James inside Hance's apartment. And in the 2020 case, a neighbor witnessed Hance fleeing

---

[2] We note that, in some contexts, police officer testimony "may be especially prejudicial because an officer's testimony often carries a special aura of reliability." State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007) (discussing police officer testimony about the veracity of another witness). But this "special aura of reliability" does not go to weight of the testimony in a joinder analysis, and James does not cite to or argue this principle.

her apartment in a bathrobe and also saw James leaving the apartment shortly thereafter.

James does not address his arguments about the admissibility of the 911 calls and Hance's sworn statement in his briefing on appeal except as to quote from his briefing before the trial court. Regardless, neither the 911 calls nor Hance's recorded statement make the strength of the evidence in the 2021 case substantially stronger than that of the 2020 case. Before trial, the court refrained from ruling on admitting the 911 calls, explaining that whether the calls qualified under a hearsay exception would be largely dependent on the testimony at trial. At trial, though both calls were discussed by witnesses, neither call was admitted into evidence.[3] James's argument as to Hance's recorded statement is similarly unavailing. At trial, police body-camera footage showing Hance speaking to officers following the 2021 incident was shown to the jury. But the contents of the 2021 footage do not outweigh the evidence supporting the 2020 case. On the contrary, the footage contains information also relayed to the jury by other witnesses—Hance telling officers that James crawled through the kitchen window and that she then called police. Similar testimony was elicited from witnesses in support of the 2020 case.

When the State's evidence is strong on each count, there is no danger that the jury will base its finding of guilt as to one count on the strength of the evidence on the other count. Bythrow, 114 Wn.2d at 721-22. Because both

---

[3] A portion of the 2021 call was played for authentication, but Hance could not identify her voice on the call and the exhibit was ultimately not admitted.

counts were supported by eyewitness testimony, the evidence is similarly strong in both cases and this factor weighs in favor of joinder.

### 2. Clarity of Defenses

James contends that he may have wanted to testify or explain his location in the 2020 case, but not in the 2021 case, and that this constitutes a difference in defenses. But the decision to testify is not the same as a defense. Moreover, the court noted that if James wanted to testify as to one case, but not the other, the court could accommodate him. Because James does not identify any conflicting defenses, this factor weighs in favor of joinder.

### 3. Jury Instruction

James contends that juries do not follow instructions, particularly when it comes to prejudicial evidence, and therefore, the jury would not be able to consider the charges separately. We disagree.

Absent indication otherwise, we presume that jury instructions are followed. Dent, 123 Wn.2d at 486. James cites no authority for a contrary proposition. And here, the court gave an appropriate instruction directing the jury to consider the charges separately. This factor weighs in favor of joinder.

### 4. Cross-Admissibility of Evidence

James focuses primarily on the fourth factor, cross-admissibility of the evidence, and maintains that the evidence from the 2020 case is irrelevant to the 2021 charges.

This factor considers, under an ER 404(b) analysis, whether evidence of each charge would be cross-admissible in separate trials. State v. Slater, 197

8

Wn.2d 660, 677, 486 P.3d 873 (2021). ER 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." "The same evidence may, however, be admissible for any other purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice." State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).

But a lack of cross-admissibility does not automatically mean the charges cannot be joined. Bluford, 188 Wn.2d at 315. To demonstrate that the trial court abused its discretion in granting joinder, a defendant must show that the prejudicial effect of trying the charges together outweighs the need for judicial economy. Bluford, 188 Wn.2d at 315. On review, we consider only facts known to the trial judge at the time of his or her ruling on a motion to join rather than the events that develop later at trial. Bluford, 188 Wn.2d at 310 ("[A] judge cannot abuse his or her discretion based on facts that do not yet exist.").

Here, the evidence was cross-admissible. James contends that Hance's fear of him would be inadmissible in the 2021 case. But based on the facts before the trial court at the time of the joinder motion, the court correctly noted that the 2020 felony harassment charge and prior violations of no-contact orders would likely come in to give the jury context for understanding the parties' relationship dynamic. See, e.g., State v. Woods, 198 Wn. App. 453, 459-60, 393 P.3d 886 (2017) (evidence that defendant previously forced victim into prostitution against her will relevant in assault trial to explain nature of victim's relationship to defendant). The court explained:

> I do think it's very likely that an explanation for why the alleged victim would be together with Mr. James, potentially voluntarily, certainly not any indication of coercive [sic] in May—two different times of 2021 the [S]tate would likely be able to explain that given the context of the entire relationship.

The court also noted that joinder would be "minimally prejudicial" because "the very fact there is a violation of a no-contact order there is the implication that there is a history of violence between the two parties."

Relying on Slater, James asserts that because the charges involve violations of a court order, there was a higher than normal prejudice in trying the charges together. 197 Wn.2d at 679. But this reliance is misplaced. In Slater, the State attempted to use the defendant's failure to appear in court as flight evidence to infer guilt for an underlying no-contact order violation. 197 Wn.2d at 666. Our Supreme Court concluded that a defendant's failure to appear, unaccompanied by additional evidence of avoiding prosecution, could not be used to infer guilt because it did not amount to a reasonable inference of flight. Slater, 197 Wn.2d at 679. The Court also noted that the only similarity between the charges in Slater was that both involved violations of court orders; they were otherwise "not connected or related in any way." Slater, 197 Wn.2d at 679-80. Therefore, similarity of charges did not weigh in favor of joinder. Slater, 197 Wn.2d at 679-80. But unlike in Slater, flight evidence is not at issue here. Instead, here, James committed several connected court order violations against the same victim but the State did not use one violation to argue guilt as to the others.

James offers no other argument for why joinder was so prejudicial as to outweigh benefits of judicial economy. We conclude that the court did not abuse its discretion in joining the two cases.

Juror Challenges

James contends that six jurors, numbers 1, 25, 29, 46, 68, and 69, displayed actual bias and that the court erred in allowing them to sit. And while James only moved to excuse jurors 1 and 29 during jury selection, he asserts that any error is not waived because the court had an independent duty to ensure his right to an unbiased jury. In light of our Supreme Court's recent decision in State v. Talbott, 200 Wn.2d 731, 521 P.3d 948 (2022) (holding that parties cannot challenge denial of a juror for cause challenge if they fail to use all their peremptory challenges), we conclude that James is precluded from challenging jurors 1 and 29 on appeal. We also conclude that the court did not err in not dismissing the other four challenged jurors.

The Sixth Amendment of the U.S. Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to a fair and impartial jury. U.S. CONST. amend VI; WASH. CONST. art. I, § 22. Seating a biased juror violates this right. State v. Guevara Diaz, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020).

During jury selection, parties may seek to remove potential jurors from the jury by making "for cause" challenges. RCW 4.44.120. The trial court must excuse a juror for cause "if the juror's views would preclude or substantially hinder the juror in the performance of [their] duties in accordance with the trial

11

court's instructions and the juror's oath." State v. Lawler, 194 Wn. App. 275, 281, 374 P.3d 278 (2016). Either party may challenge a juror for cause based on the presence of "actual bias." RCW 4.44.170(2); CrR 6.4. "Actual bias" is "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). To exclude a potential juror for actual bias, "the court must be satisfied, from all the circumstances, that the juror cannot disregard [their bias] and try the issue impartially." RCW 4.44.190; State v. Griepsma, 17 Wn. App. 2d 606, 612, 490 P.3d 239 (2021). "[E]quivocal answers alone do not require a juror to be removed when challenged for cause, rather, the question is whether a juror with preconceived ideas can set them aside." State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991).

The party challenging the juror must show more than a "mere possibility" that the juror was prejudiced; the juror's testimony must demonstrate a probability of actual bias. Noltie, 116 Wn.2d at 838-40. But "[i]f the court has only a 'statement of partiality without a subsequent assurance of impartiality,' a court should 'always' presume juror bias." Guevara Diaz, 11 Wn. App. 2d at 855 (quoting Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004)). Moreover, the court does not need to excuse a juror with preconceived opinions if the court is satisfied, from all the circumstances, that juror can set those ideas aside and try the issue impartiality. RCW 4.44.190. The trial court has a freestanding obligation to dismiss a biased juror where grounds for a for cause challenge exist

12

even if neither party challenges that juror. Guevara Diaz, 11 Wn. App. 2d at 855; State v. Irby, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015).

A trial court is in the best position to evaluate a juror's ability to be fair and impartial because it can assess the juror's "tone of voice, facial expressions, body language, or other forms of nonverbal communication when making [their] statements." Lawler, 194 Wn. App. at 287. Therefore, we review a trial court's decision to not dismiss a juror for abuse of discretion. Guevara Diaz, 1 Wn. App. 2d at 856. The court abuses its discretion when it bases its decision on untenable grounds or reasons. Powell, 126 Wn.2d at 258.

In addition to making for cause challenges, parties may remove potential jurors through the use of peremptory challenges. RCW 4.44.130. "A peremptory challenge is an objection to a juror for which no reason need be given, but upon which the court shall exclude the juror." RCW 4.44.140. Each party receives only a limited number of these challenges. RCW 4.44.130.

1. Jurors 1 and 29

Our Supreme Court recently clarified in Talbott that "if a party allows a juror to be seated and does not exhaust their peremptory challenges, then they cannot appeal on the basis that the juror should have been excused for cause." 200 Wn.2d at 747-48.

In Talbott, the trial court denied defendant William Talbott's motion to excuse a prospective juror for cause. 200 Wn.2d at 735. Rather than remove the juror with a peremptory challenge, Talbott affirmatively accepted the jury panel, including the previously challenged juror, without exhausting his

13

peremptory challenges on other prospective jurors. <u>Talbott</u>, 200 Wn.2d at 736.

After he was convicted, Talbott appealed the denial of his for cause challenge.

<u>Talbott</u>, 200 Wn.2d at 736-37. Our Supreme Court reaffirmed "a long line of

precedent holding that a party who accepts the jury panel without exhausting

their peremptory challenges cannot appeal 'based on the jury's composition.' "

<u>Talbott</u>, 200 Wn.2d at 732 (quoting <u>State v. Clark</u>, 143 Wn.2d 731, 762, 24 P.3d

1006 (2001)).

The facts of this case mirror those in <u>Talbott</u>. Here, James's for cause

challenges to jurors 1 and 29 were denied. He did not later attempt to strike

them by using a peremptory challenge. He then accepted the jury—with jurors 1

and 29 on it—without using all of his peremptory challenges. Under <u>Talbott</u>, he is

precluded on appeal from challenging those jurors. On this basis, we reject

James's claim as to jurors 1 and 29.

2. <u>Jurors 25, 46, 68, 69</u>

Though James did not challenge jurors 25, 46, 68, and 69 during jury

selection, he asserts that these jurors demonstrated actual bias when asked

about the no-contact order between Hance and James and James's decision not

to testify. He also contends that these jurors did not give subsequent

assurances of impartiality and that the court's question to the jury about their

ability to follow the law did not sufficiently rehabilitate the jurors. He maintains

that it was the duty of the court to dismiss them sua sponte, and that it erred by

14

not doing so. We conclude that none of the jurors demonstrated actual bias, and that the court did not err in not dismissing them.

While we generally do not consider issues raised for the first time on appeal, a narrow exception exists for manifest error affecting a constitutional right. RAP 2.5(a)(3). A party demonstrates manifest constitutional error by showing that the issue affects a constitutional right and results in actual prejudice. State v. O'Hara, 167 Wn.2d 91, 98-100, 217 P.3d 756 (2009). "Because '[t]he presence of a biased juror cannot be harmless,' " such error mandates " 'a new trial without a showing of actual prejudice.' " Guevara Diaz, 11 Wn. App. 2d at 851 (alteration in original) (internal quotation marks omitted) (quoting United States v. Gonzalez, 214 F.3d 1109, 1111 (9th Cir. 2000)). Thus, if the record demonstrates that a juror exhibited actual bias, seating that juror constitutes a manifest error that can be raised for the first time on appeal. Irby, 187 Wn. App. at 193.

James's failure to challenge these jurors for cause before the trial court therefore does not impact his ability to raise this issue on appeal. " '[I]f the record demonstrates the actual bias of a juror, seating the biased juror [is] a manifest [constitutional] error' " that can be raised for the first time on appeal. Guevara Diaz, 11 Wn. App. 2d at 854 (quoting Irby, 187 Wn. App. at 193).

*Existence of No-contact Order:* During jury selection, counsel asked whether the existence of a no-contact order made it more likely that someone would commit a crime. James asserts that responses from jurors 25, 68, and 69 constitute actual bias.

15

Juror 25 stated: "Yeah, it seems more likely that an offense was made if—after a contact order is established . . . [it] does seem more likely that that would be a realistic scenario." Defense counsel did not ask juror 25 any further questions and did not move to excuse juror 25.

Juror 68 raised their hand to answer "yes" to counsel's question but qualified their response. They stated:

> I guess I would have to hear more about what the woman is saying about the situation and then add to it the piece that there was like a restraining order. So like I'd have to hear both before I make that decision.

Juror 69 also agreed that the existence of a no-contact order might make it more likely that someone would commit a crime. They explained:

> Well, I think if someone has a restraining order you'd have to say, well, why did they get that restraining order and it would be plying you to think they had done something wrong, I think.

When pressed on the issue, juror 69 clarified: "I think you'd be inclined in that direction, but not to say probable [that they committed the additional crime]."

Here, these three challenged jurors each gave equivocal statements that did not necessitate dismissal by the judge. Though each juror initially expressed that the existence of a no-contact order would make it more likely that someone would commit crimes, their answers were either further qualified or equivocal enough not to indicate actual bias. For example, juror 25's lone statement that the existence of a no-contact order would make it "more likely" an offense would be committed does not show more than a mere possibility that the juror would be prejudiced. And even if this statement qualified as a preconceived opinion, the court did not need to excuse juror 25 unless it believed that juror 25 could not set

16

aside that opinion and try the issue impartiality. RCW 4.44.190. James does not argue, and the record does not suggest, any other relevant information that would lead us to believe that juror 25 could not try the issue impartially. Likewise, jurors 68 and 69 both gave equivocal answers and neither was questioned further by defense counsel on their ability to be fair and impartial. The record is insufficient to demonstrate that the court erred in not sua sponte dismissing these jurors.

James claims that this case in analogous to Irby. He is mistaken. In Irby, a potential juror who had worked for Child Protective Services stated that the experience made her "more inclined towards the prosecution" and admitted that she "would like to say [the defendant]'s guilty." 187 Wn. App. at 190. The Irby juror's statement of partiality is a far cry from the statements at issue in this case. The jurors' statements in the present case were all equivocal, did not indicate that they would like to say James was guilty, and to our knowledge, the jurors here are not former employees of the State.

*Decision Not to Testify:* James asserts that jurors 46 and 69 expressed bias when asked about James's decision not to testify. After questioning another juror, defense counsel summarized that juror's response as follows:

> So in this case if Mr. James chose not to testify it would raise a question in your mind. You would start to think he probably did it because if he was innocent he would have testified.

Defense counsel then asked if any other jurors agreed with that statement and six additional jurors, including juror 46, raised their hands. Defense counsel moved to dismiss all the jurors who raised their hands, but the court directed

17

counsel to follow-up with each individual juror.  Counsel followed-up with several jurors, but did not ask any further questions of juror 46.

Juror 69 agreed with a similar statement.  And in response to defense counsel's follow-up question about whether they were "confident [they]'d be able to put that out of [their] mind if instructed by the judge," juror 69 gave an equivocal response: "I suspect that at the end of the day it will be dependent upon the evidence you hear whether your bias comes to the fore or drops away." Counsel pressed further:

> So in other words, if the prosecutor doesn't provide sufficient evidence for you to feel that Mr. James is guilty then you would not hold the fact that maybe he didn't testify against him.  You would hold the prosecutor to their burden; is that right?  Is that what you're saying?

Juror 69 replied: "Yeah, yes."

Neither juror 46 or 69's statements rise to the level of actual bias.  Though juror 69's original answer was equivocal, counsel's follow-up question about holding the prosecution to their burden of proof cemented that the juror could be impartial.  Juror 46 was not questioned on the record about their raised hand and James offers no other argument to suggest that juror 46 displayed more than a possibility of bias.  Absent such an argument or any indicia from the record that juror 46 exhibited bias, we defer to the trial court's decision not to sua sponte dismiss juror 46.  Lawler, 194 Wn. App. at 287 ("[W]e emphasize again that the trial court is in the best position to evaluate whether a juror must be dismissed.").  Moreover, on several occasions, the court reminded defense counsel how to make for cause challenges.  See Lawler, 194 Wn. App. at 287-88 (noting that the

18

trial court paying attention during voir dire supported inference that court did not err in not dismissing juror). And when the court listed off the jurors to be seated, including 46, defense counsel did not move to challenge juror 46 again. Under these circumstances, a raised hand is not enough to demonstrate actual bias. Neither juror 46 nor 69 demonstrated bias.

James also contends that the court's blanket question to the jurors about their ability to be fair and impartial cannot rehabilitate biased jurors. He again asserts that this case is analogous to Irby, in which this court concluded that "questions directed to the group cannot substitute for individual questioning of a juror who has expressed actual bias." 187 Wn. App. at 196. Here, when the judge asked if any jurors had concerns about their ability to be fair and impartial, no jurors raised their hands. But we need not consider this argument as none of the four jurors expressed actual bias.

### Sufficiency of Evidence

James asserts that the court erred in denying his motion to dismiss the FVNCO based on the letters to Hance's cats. He claims that the letters were not sufficient evidence to sustain a conviction. We conclude that sufficient evidence supports James's conviction because the letters demonstrate he knowingly tried to contact Hance.

Due process requires the State to prove beyond a reasonable doubt every element of the crimes charged. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Evidence is sufficient to support a guilty verdict if, " 'after viewing the evidence in the light most favorable to the prosecution, *any*

19

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " State v. Condon, 182 Wn.2d 307, 314, 343 P.3d 357 (2015) (quoting State v. Luvene, 127 Wn.2d 690, 712, 903 P.2d 960 (1995)). In challenging sufficiency of the evidence on appeal, the defendant admits the truth of all the State's evidence. State v. Cardenas-Flores, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). Evidence is viewed in the light most favorable to the State, drawing all reasonable inferences in the State's favor. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial and direct evidence are considered equally reliable. State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004). We review de novo whether the evidence was sufficient to support a conviction. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Here, the protection order prohibited James from contacting or attempting to contact Hance "directly, indirectly, in person or through others, by phone, mail, electronic or other means." The State was required to prove that James knowingly violated the provisions of the no-contact order. Former RCW 26.50.110(1) (2019) (elements of FVNCO). That James sent Hance letters—ostensibly addressed to her cats—in an attempt to contact her qualifies as a violation regardless of whether the letters reached her. This is sufficient to sustain a conviction.

This case is analogous to State v. Ward. 148 Wn.2d 803, 64 P.3d 640 (2003). In Ward, our Supreme Court determined that a telephone call to a protected person's house, answered by the protected individual's wife, was sufficient to sustain a no-contact order violation conviction. 148 Wn.2d at 815-

20

16. The Court expressly rejected petitioner's argument that the evidence was insufficient because it "established no more than an attempted violation." Ward, 148 Wn.2d at 815-16. Instead, the Court concluded that the evidence was sufficient to support a conviction where petitioner was prohibited from contacting (directly or indirectly) the protected party and petitioner called the protected individual's home and conveyed information to their wife. Ward, 148 Wn.2d at 816.

James asserts Ward is distinguishable and contends that an attempted contact is insufficient to sustain a conviction. But Ward expressly rejected this argument. 148 Wn.2d at 815-16. James was prohibited from contacting Hance via any means, including third parties; his admission that he attempted to contact Hance via her neighbor is enough to support a conviction. The evidence was sufficient.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____          _____
Bowman, J.                                               Mann, J.

21