# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  58144-2-II |
| Respondent | |
| v. | |
| RODNEY LARRY NICHOLS, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Rodney L. Nichols appeals his convictions for raping and molesting his grandchildren, J.B. and R.B.  Nichols argues that the trial court erred in admitting unfairly prejudicial and irrelevant evidence in violation of the trial court's in limine ruling.  Nichols also argues that the State committed prosecutorial misconduct in closing arguments and that the cumulative effect of the trial court's errors denied him a fair trial.  In addition, Nichols contends that the trial court erroneously imposed the crime victim penalty assessment (VPA) and the DNA collection fee.

We affirm Nichols' convictions but remand for the trial court to strike the VPA and the DNA collection fee.

## FACTS

### I.  BACKGROUND

In 2020, J.B. and R.B. told their adoptive parents that Nichols, their biological grandfather, had sexually abused them in the past.  The parents reported the allegations to law enforcement.

As part of the investigation, J.B. and R.B. were interviewed by a forensic interviewer. During J.B.'s forensic interview, J.B. explained her account of how Nichols had sexually abused her and her sister, R.B.

The State ultimately charged Nichols with two counts of first degree child molestation and two counts of first degree rape of a child for conduct that allegedly occurred between 2014 and 2018. Each count also alleged aggravating circumstances of abuse of trust or confidence and an ongoing pattern of sexual abuse of the same minor victim.

II. MOTIONS IN LIMINE

The case proceeded to a jury trial. In a pretrial motion in limine, Nichols sought to exclude evidence of prior bad acts and any testimony regarding allegations of drug use by Nichols. As part of this motion, Nichols sought to exclude evidence that as a result of Child Protective Services (CPS) investigations, J.B. and R.B. were not permitted to live with Nichols and his wife.

The State responded that it had no objection to excluding testimony about Nichols' drug use. However, the State sought to call CPS workers to testify that they observed J.B. and R.B. at Nichols' home. According to the State, the CPS workers would testify that they were working on J.B. and R.B.'s cases and that, in the course of this work, they had interactions with Nichols at his home. The State also wanted to introduce testimony from the workers that because of an existing parenting plan, the children were not permitted to be at Nichols' home, arguing that the testimony was relevant to show why "CPS workers were so familiar and checking so often on the home." Verbatim Rep. of Proc. (VRP) at 194.

The trial court ruled that CPS workers could testify that they observed J.B. and R.B. at Nichols' home during the charged time period because it showed that Nichols had an opportunity

to commit the crimes. However, the trial court ruled that other aspects of their testimony, including

whether J.B. and R.B. were not supposed to be staying with Nichols, would be excluded. The trial

court stated,

> The information has a relatively limited purpose. It goes to opportunity. . . . So, the information is admissible only for the limited purpose of showing that, during the period of time when the allegations are supposed to have occurred, that Mr. Nichols and the children were in contact with each other at his home. *So, people can testify, we went to his home, the kids were there*. You know? We saw the kids in this house. That sort of thing. During this time period. *That's all people can testify about*. Whether or not they were living there, well, s[t]aying there or not doesn't sound like it would be relevant. *And the reasons why they were or weren't supposed to be there don't sound to be relevant. And so, that is excluded*.

VRP at 194-95 (emphasis added).

The case proceeded to jury selection and opening statements.

III. TRIAL

Following opening statements, the State began its case. J.B., R.B., their adoptive parents,

a law enforcement officer, and the forensic interviewer testified consistently with the facts set forth

above. The video of J.B.'s forensic interview was admitted into evidence.

J.B. and R.B. testified at length about how Nichols repeatedly raped and molested them

while they were alone with him at his home over several years. Both children were under the age

of 12 at the time of the sexual abuse. J.B. said that she told her biological mother, Melissa

Murdock, and Nichols' wife, Samantha[1] (J.B. and R.B.'s grandmother), about the abuse, but J.B.

was not believed.

---

[1] We refer to Nichols' wife by her first name to avoid confusion. No disrespect is intended.

In addition to detailing the sexual abuse allegations, R.B. testified that CPS "followed" Murdock when Murdock had picked up her younger sister A. after school. VRP at 454. Nichols did not object.

Also testifying for the State were two CPS workers, Jay Redmond and Jennifer Gorder. Redmond testified about his familiarity with the children, the grandmother Samantha, and Murdock. Redmond testified that he knew the children because he was a CPS investigator for three intake investigations about them. Nichols did not object. Redmond also described his interactions with Samantha during the course of his investigations. Redmond explained that Samantha had an "oppositional demeanor" and was not cooperative in trying to locate J.B. and R.B. for his investigation. VRP at 508. Nichols did not object on the basis that the testimony violated the trial court's in limine ruling or that it was unfairly prejudicial.[2]

Redmond also testified about his interactions with Murdock. Redmond stated that he had interviewed the children at their school and that he had also had contact with them at Murdock's house. Redmond further testified that he went to, and drove by, Nichols' home on several occasions looking for J.B. and R.B. After not locating J.B., R.B., and their younger sister A. for a period of time, Redmond showed up at their school at their usual pickup time. According to Redmond, he saw Murdock in the parking lot and asked where A. was. Murdock became angry and quickly left with J.B. and R.B. Shortly afterward, Redmond went to the Nichols' home and observed Murdock running away from the house with A. At that point, CPS called law

---

[2] Nichols, however, did object to part of Redmond's testimony as being nonresponsive. The trial court overruled Nichols' objection.

enforcement and all the children were placed in protective custody. Nichols did not object to this testimony.

Gorder then testified and explained that she knew J.B. and R.B. were at the Nichols' home "[q]uite a bit." VRP at 533. Like Redmond, Gorder testified that she also interacted with Samantha. Gorder stated that Samantha did not like CPS and she "let [Gorder] know it." VRP at 541. Nichols did not object to this testimony.

Following Gorder's testimony about Samantha not liking CPS, the State asked Gorder if she had made any findings on the children's case. Gorder responded, "Yes. I did." VRP at 541. Nichols did not object to that question. The State then began to ask another question, "And what was . . . " when Nichols objected, stating that the question was irrelevant and had "been ruled in a motion in limine." VRP at 541. Before the trial court made any ruling on the objection, the State moved on to ask a different question.

The State rested.

The defense case included the testimony of Murdock and Samantha. Nichols did not testify.

IV. Jury Instructions and Closing Arguments

The trial proceeded to jury instructions. With respect to the first degree child rape counts, the trial court gave jury instruction 11, which told the jury:

> To convict the defendant on any count of rape of a child in the first degree, one particular act of rape of a child in the first degree as to that count must be proved beyond a reasonable doubt. And you must unanimously agree as to which act has been proved.
>
> You need not unanimously agree that the defendant committed all the acts of rape of a child in the first degree.

5

No. 58144-2-II

VRP at 639-40. The trial court also gave jury instruction 17, which was a similar unanimity instruction with respect to the child molestation counts.

Following the instructions to the jury, the parties gave their closing arguments. As part of its closing, the State discussed the reasonable doubt standard. The State explained that to convict Nichols of each charge that the jury must be satisfied beyond a reasonable doubt that Nichols committed each charge. The State then reiterated the definition of reasonable doubt as

> one for which a reason exists and may arise from the evidence or a lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all the evidence or a lack of evidence. If from such consideration you have an abiding belief in the . . . truth of the charge, you are satisfied beyond a reasonable doubt.

VRP at 649.

Following its discussion of the reasonable doubt standard, the State argued that the evidence showed that Nichols raped and molested the children in many different ways over several years and explained how, in its view, that evidence was tied to the specific charges. The State next argued that the exact number of sexual assaults that Nichols had committed did not matter, stating,

> The exact number of sexual assaults the defendant committed doesn't matter. Jury [i]nstructions 11 and 17 tell you, *you all need to unanimously agree that one instance of a particular sexual assault occurred for each count*. And that one makes him guilty of that count. Pick which one unanimous on one count [sic]. One instance, that's a guilty on those counts.

VRP at 650 (emphasis added).

The State then recounted J.B.'s and R.B.'s detailed testimony about each time they were raped by Nichols. When the State finished discussing this extensive testimony about the rapes, the State argued,

> Ladies and gentlemen, the defendant committed multiple acts of rape of a child in the first degree—in the first degree over the span of several years. *The exact*

6

> *number doesn't matter.* If you believe the defendant committed any of these acts, he's guilty of this count . . . .

VRP at 657 (emphasis added). Nichols did not object.

The State made similar comments about the child molestation counts, arguing,

> Again, the defendant committed multiple acts of child molestation in the first degree over a span of several years. *Exact number doesn't matter. If you believe the defendant committed any one of those acts we just talked about*[,] [h]e's guilty of child molestation in the first degree against [R.B.] and [J.B].

VRP at 660 (emphasis added). Nichols did not object.

In the defense's closing argument, Nichols attacked the credibility of the children. Nichols argued that aspects of their accounts were inconsistent with each other and changed over time. He also suggested that the children had a motive to fabricate the allegations about Nichols because they did not like Nichols or Murdock and wanted to stay with their adoptive parents.

In its rebuttal, the State responded to Nichols' suggestion that the children had a motive to fabricate their allegations by emphasizing that they had been speaking *their* truth. The State argued,

> There's no motive whatsoever to make this up. They've been speaking *their truth* since 2020 at a great emotional cost to them and *that truth* is that the defendant raped and molested them.

VRP at 677 (emphasis added). Nichols did not object.

Responding to Nichols' argument that J.B.'s and R.B.'s accounts were inconsistent, the State argued that the inconsistencies were "natural" and "normal" and that their testimony was actually consistent when they testified about what Nichols actually did to them. VRP at 679. The State also suggested that the memory of a child is not perfect and that it did not need to be perfect. The State argued,

7

Especially, how accurate is a memory of a child? It's not perfect when you're that age. It doesn't have to be.

VRP at 680. The State further argued that although the children's "accounts were not perfect," there were too many similarities for children their age "who should not know about the sexual things they're talking about." VRP at 681.

The State then contended that it was not required to have a "perfect case" and witnesses were not required to be perfect because "[w]itnesses make mistakes, time passes, [and] memories fade." VRP at 681. The State argued,

> What defense [counsel] is confusing is the difference between things that create an actual reasonable doubt and things that make the State's case *not perfect*. Some of the things the defense has raised show the case of the State is *not perfect*. That every detail wasn't remembered or maybe people didn't act the way you or I would have in their situation.
>
> When you're deliberating, the instructions don't ask if everything *was perfect*. They ask if you have an abiding belief in the truth of the charge, an abiding belief that this happened. When deliberating, be mindful of these arguments by defense [counsel] that shift the focus in a way that equates imperfections with reasonable doubt. Because, that's wrong.

VRP at 681-82 (emphasis added). Nichols did not object.

Immediately after these remarks, the State then returned to the trial testimony and suggested that the children were credible witnesses based on what they testified about, how they testified, their demeanor, and how the disclosure affected them. In so doing, the State used the phrase "enforce a belief" several times. VRP at 682. The State argued,

> When you heard [R.B.] and [J.B.] testify to the abuse. Tell me that what they said and how they said it doesn't *enforce [a] belief* that this happened. When you watched [J.B.] on the video uncomfortably tell a stranger about the abuse, tell me that that doesn't *enforce a belief* that this happened.
>
> Now, remember when you heard [the adoptive father] recount what [J.B.] told him and how it affected him. Tell me that doesn't *enforce a belief* that this happened.

> If you 12 deliberate and say we have an abiding belief that these crimes happened, then it is your job to return a guilty verdict.

VRP at 682 (emphasis added). Nichols did not object.

V. VERDICT, SENTENCING, AND APPEAL

The jury found Nichols guilty as charged. The trial court imposed a sentence of 318 months to life. The trial court also found Nichols indigent, yet it imposed the VPA and DNA collection fee.

Nichols appeals.

ANALYSIS

Nichols makes four arguments. Nichols argues that (1) the trial court erred in admitting unfairly prejudicial and irrelevant evidence that violated its in limine ruling, which excluded evidence of previous CPS engagement with the family, (2) the State committed prosecutorial misconduct in closing argument, (3) the cumulative effect of the trial court's errors denied Nichols a fair trial, and (4) the trial court erroneously imposed the VPA and the DNA collection fee. We address each in turn.

I. EVIDENTIARY ERROR

Nichols argues that the trial court erred by admitting irrelevant and unfairly prejudicial evidence of "previous CPS engagement" with Murdock and Samantha in violation of the trial court's in limine ruling. Br. of Appellant at 15. The State responds that because Nichols failed to object to this evidence at trial, he may not raise it on appeal. We agree with the State.

9

A.  LEGAL PRINCIPLES

In general, appellate courts will not consider issues raised for the first time on appeal.  *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).  This principle is embodied in RAP 2.5(a), which was adopted to encourage " 'the efficient use of judicial resources.' "  *State v. Robinson*, 171 Wn.2d 292, 304, 253 P.3d 84 (2011) (quoting *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)).  The rule provides appellate courts with discretion to refuse to review any claim of error which was not raised in the trial court.  RAP 2.5(a).  This ensures that the trial court has the opportunity to correct any errors, "thereby avoiding unnecessary appeals."  *Robinson*, 171 Wn.2d at 304.  In order to preserve evidentiary issues for appeal, trial counsel must generally object at the time the evidence is offered.[3]  *Kirkman*, 159 Wn.2d at 926.

But when an evidentiary ruling is made pursuant to motions in limine, the obligation to object may be affected.  For example, when the trial court makes a final ruling *denying* a party's motion in limine, that party generally has a standing objection and is not required to object during trial to preserve the issue unless the trial court indicates that further objections at trial are required.  *State v. Powell,* 126 Wn.2d 244, 256, 893 P.2d 615 (1995).  The reason is because one of the purposes of motions in limine is to avoid the requirement that counsel object to contested evidence when it is offered during trial.  *Id.*

---

[3] A notable exception is that a party can raise an error for the first time on appeal if it is a manifest error affecting a constitutional right.  *State v. J.W.M.*, 1 Wn.3d 58, 90, 524 P.3d 596 (2023).  But in general, evidentiary errors are not of constitutional magnitude.  *State v. Powell*, 166 Wn.2d 73, 84, 206 P.3d 321 (2009).

However, when a party is *successful* in excluding evidence in limine, there is no standing objection. *State v. Sullivan*, 69 Wn. App. 167, 171-72, 847 P.2d 953, *review denied*, 122 Wn.2d 1002 (1993). The successful party is still required to object to the introduction of evidence that may violate the in limine ruling during trial in order to permit the trial court an opportunity to cure any potential prejudice and preserve the issue for appeal. *Id.* Otherwise, a party who wins a motion in limine but fails to point out potential violations at trial could "simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal." *Id.* at 172.

B. NICHOLS FAILED TO PRESERVE HIS CHALLENGE TO THE ALLEGED EVIDENTIARY ERRORS

Nichols argues that the trial court erred in admitting various evidence concerning CPS investigations. Nichols characterizes the nature of the trial court's error as violating the ruling from his successful motion in limine—that is, "admit[ting] excluded evidence of ongoing CPS investigations . . . ." Br. of Appellant at 17. Nichols argues that such evidence was not probative of any charged element and was unfairly prejudicial.

Nichols points to several specific instances of testimony that he argues violates the in limine ruling. Nichols cites to (1) R.B.'s testimony that CPS "followed" her mother, (2) CPS worker Redmond's testimony that he was familiar with the children because he was the CPS investigator on three intake investigations concerning them, that he visited the children's school and the Nichols' home, and that Samantha displayed an oppositional demeanor towards him, and (3) CPS worker Gorder's testimony that she was at the Nichols' home "quite a bit" and that she

had "made findings" in the children's case. Br. of Appellant at 17, 19-20 (internal quotation marks omitted). In each instance, Nichols failed to object.[4]

The State argues that Nichols' failure to object to this evidence is fatal to his claim. Because of this failure, the State contends that Nichols may only raise this issue for the first time on appeal if he can establish a manifest constitutional error under RAP 2.5(a)(3). The State asserts that we should decline to review this alleged error because, in general, evidentiary errors are not of constitutional magnitude.

Nichols does not address either manifest error or RAP 2.5 in his opening brief related to his evidentiary argument. In his reply brief, Nichols simply contends that RAP 2.5 does not apply because "this evidentiary issue was litigated in the trial court." Reply Br. at 6. Although it is true that this issue was litigated pretrial through Nichols' motion in limine, Nichols is mistaken that this means he did not need to object to preserve the error. Assuming Nichols' characterization is accurate—that the alleged error was the admission of evidence that had been excluded by the trial court's in limine ruling (that Nichols succeeded in obtaining), Nichols was required to object to preserve the issue. *Sullivan*, 69 Wn. App. at 171-73 (holding that when a party successfully moves

_____

[4] As noted above, the State asked Gorder if she had made any findings on the children's case. Gorder responded, "Yes, I did." VRP at 541. Nichols did not object to that question. But when the State then began to ask another question, "And what was . . .[,]" Nichols did object on the basis that the question allegedly violated the trial court's in limine ruling. VRP at 541. Because the State immediately asked a different question, the question was not answered, and the trial court did not rule on the objection.

Nichols characterizes this objection as pertaining to the State's previous question as to whether Gorder had made any findings. But the transcript belies that characterization—Nichols' objection appears to be anticipating a substantive answer about findings, and not attempting to retroactively address the previous question.

in limine to exclude evidence, it is still required to object to the introduction of that evidence at trial in order to allow the trial court an opportunity to cure any potential prejudice and preserve the matter for appeal). Nichols failed to do so. And he makes no argument that the trial court's alleged error was of a constitutional magnitude. Thus, Nichols did not preserve these claims of evidentiary error, and we decline to consider them.

## II. PROSECUTORIAL MISCONDUCT

Nichols next argues that the State committed prosecutorial misconduct during closing argument. We disagree.

### A. LEGAL PRINCIPLES

In a prosecutorial misconduct claim, the defendant bears the burden of showing that the prosecutor's conduct was improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Generally, we first evaluate whether the prosecutor's conduct was improper. *Id.* at 759. If the prosecutor's conduct was improper, we then determine if the conduct prejudiced the defendant. *Id.* at 760. Prejudice is established by showing a substantial likelihood that the prosecutor's misconduct affected the verdict. *Id.*

However, if the defendant fails to object to the State's remarks at trial, any error regarding prosecutorial misconduct is deemed to have been waived unless the misconduct was "so flagrant and ill[-]intentioned that [a jury] instruction could not have cured the resulting prejudice." *Id.* at 760-61. For this inquiry, we generally focus on whether the resulting prejudice could have been cured and less on whether the prosecutor's misconduct was flagrant and ill-intentioned. *Id.* at 762.

13

B.  THE STATE DID NOT COMMIT PROSECUTORIAL MISCONDUCT

Nichols argues that the State committed prosecutorial misconduct in closing argument on several occasions.  First, Nichols asserts that the State misstated the law on jury unanimity when it purportedly argued that the jury was not required to unanimously agree on a particular act in order to convict Nichols.  Second, Nichols argues that the State improperly vouched for the children's credibility.  And lastly, Nichols argues that the State committed misconduct by misstating the burden of proof and inviting the jury to find him guilty based on a lower standard. On each occasion, Nichols failed to object.

1.  The State did not misstate the law on jury unanimity

Nichols argues that the State misstated the law on unanimity and undermined his right to a unanimous verdict when it argued that "the exact number of sexual assaults '[did not] matter' " and that the jury should convict if they believed Nichols committed " 'any one of those acts we just talked about.' "  Br. of Appellant at 23 (quoting VRP at 657, 660).  According to Nichols, the prosecutor "flagrantly misstated the law when he told jurors they are not required to unanimously agree on a particular act in order to convict" and misled jurors "to understand if they believed any of the acts occurred, they should convict."  *Id.* at 24-25 (emphasis omitted).  Nichols contends that each of the State's remarks allowed individual jurors to believe an act occurred "that may – or may not – be different from what a separate juror believed."  *Id.* at 25.

Viewed in a vacuum, the State's remarks specifically referenced by Nichols could be seen as potentially ambiguous.  But when viewed in the context of the State's closing argument as a whole, the remarks were not improper.  *See State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011) (explaining that "[w]hen reviewing a claim that prosecutorial misconduct requires

reversal, the court should review the statements in the context of the entire case"). Prior to the comments cited by Nichols, the State had already clearly and accurately told the jury that they needed to "unanimously agree that *one instance* of a particular sexual assault occurred for each count." VRP at 650 (emphasis added). Against this backdrop, none of the State's later remarks were actually inconsistent with this correct statement of the law. Telling the jury that "[t]he exact number" of assaults does not matter is true; neither this statement nor encouraging the jury to convict if Nichols committed "any one of" the alleged acts actually contradicts the duty of the jury to be unanimous on any one specific incident.[5] VRP at 657, 660.

But even if the State's remarks are viewed in isolation and characterized as ambiguous and, thus, potentially improper, Nichols failed to object. Accordingly, he must show that the alleged misconduct could not have been cured by an instruction from the trial court. *Emery*, 174 Wn.2d at 760-61. But here, given that the State's comments were merely ambiguous, at best, any potential confusion in the minds of the jury could have been readily cured by a simple instruction from the trial court.

2. The State did not vouch for J.B. and R.B.

Nichols next argues that the State committed misconduct when it purportedly vouched for J.B.'s and R.B.'s credibility.[6] Specifically, Nichols contends that the State improperly bolstered

---

[5] Moreover, in addition to the State's earlier articulation of the correct standard, the trial court gave jury instructions 11 and 17, which also accurately explained to the jury its obligation to be unanimous as to any given instance of abuse used to support a particular count. These instructions would have provided a further foundation for the jury to view the State's later closing argument.

[6] Improper vouching generally can occur in two ways. First, if the prosecutor expresses a personal belief as to the veracity of the witness. *Thorgerson*, 172 Wn.2d at 443. And second, if the prosecutor indicates that evidence not presented at trial supports the witness's testimony. *Id.*

the children's testimony when the State argued in its rebuttal that J.B. and R.B. were " 'speaking their truth . . . and that truth is that the defendant raped and molested them.' " Br. of Appellant at 26 (emphasis omitted) (quoting VRP at 677). Nichols contends that this argument implied to the jurors that "the prosecutor knew some 'truth' based on information not presented at trial." Br. of Appellant at 26-27.

Nichols' argument ignores the actual language used by the State. If the State had argued that the witnesses spoke "the truth," perhaps the argument would have some merit. But that is not what the State said—the State argued that the children were speaking "*their* truth." VRP at 677 (emphasis added). This difference is dispositive; the State was clearly referring to the children's view of their own testimony, not the State's personal belief as to the veracity of testimony or that the State has some sort of independent information not presented at trial. Thus, Nichols' argument about improper vouching fails.

3. The State did not lower the standard for conviction

Finally, Nichols argues that the State misstated the law by arguing that the jury should apply a lower standard of proof. Nichols bases this argument on two issues (1) the State's comments made about the children's testimony, and (2) the State's use of the phrase "enforce a belief." Br. of Appellant at 29.

a. Children's testimony and imperfect case.

Regarding the children's testimony, Nichols points to the State's comments made in rebuttal that the memories of children were imperfect. Nichols contends that the State "urged jurors to draw the false distinction between inconsistencies that make the State's case 'not perfect' and those that create an 'actual reasonable doubt.' " Br. of Appellant at 27-28 (quoting VRP at

681-82). According to Nichols, "[t]elling jurors to excuse [the children]'s imperfect memories and give them the benefit of the doubt because of their ages amounted to a lowering of the burden of proof." Br. of Appellant at 28.

However, contrary to Nichols' characterization, the State did not suggest that the jury should apply a lower burden of proof. Rather, the State was merely responding rhetorically to Nichols' contention that the children's testimony had some inconsistencies. The State argued that these inconsistencies were "natural" and "normal" and that their testimony was actually consistent about the core facts of what Nichols actually did to them. VRP at 679. The State also argued, that although the children's "accounts were not perfect," their accounts had too many similarities for children their age "who should not know about the sexual things they're talking about." VRP at 681. The State argued that it was not required to have a "perfect case" and witnesses were not required to be perfect because "[w]itnesses make mistakes, time passes, [and] memories fade." VRP at 681.

Viewing the State's rebuttal as a whole, the State's remarks were valid argument in response to defense counsel's closing argument. *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994) ("[T]he prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel."). The State was responding to defense counsel's claim that the children's testimony was inconsistent and explaining why those inconsistencies should be viewed in context. None of the State's remarks about the imperfect nature of its case or children's testimony can fairly be said to be a misstatement, or lowering, of the reasonable doubt standard. Nichols fails to show any prosecutorial misconduct related to these remarks.

b. "Enforcing a belief"

Nichols further argues that the State's repeated uses of the phrase "enforce a belief" was improper. Br. of Appellant at 29. The State used this phrase when it was discussing the children's testimony, J.B.'s demeanor in her forensic interview, and her adoptive father's testimony. The State argued,

> When you heard [R.B.] and [J.B.] testify to the abuse. Tell me that what they said and how they said it doesn't *enforce [a] belief* that this happened. When you watched [J.B.] on the video uncomfortably tell a stranger about the abuse, tell me that that doesn't *enforce a belief* that this happened.

> Now, remember when you heard [the adoptive father] recount what [J.B.] told him and how it affected him. Tell me that doesn't *enforce a belief* that this happened.

> If you 12 deliberate and say we have an abiding belief that these crimes happened, then it is your job to return a guilty verdict.

VRP at 682 (emphasis added).

Nichols argues that the phrase "enforce a belief" is not found in the jury instructions and represents an incorrect standard. Br. of Appellant at 29. Nichols appears to argue that because the correct standard for reasonable doubt involves the phrase "abiding belief," the phrase "enforcing a belief" represents a flagrant and ill-intentioned attempt by the State to mischaracterize the burden of proof.

Nichols exaggerates the effect of the State's language. Read in context, the State's comments can be seen as further explaining how to apply the standard of "an abiding belief" rather than the creation of an entirely new standard. Prior to using the "enforcing a belief" phrase, the State had already explained to the jury that the instructions focused on an abiding belief in the truth of each charge. And, as shown above, the State correctly used the complete phrase "abiding belief" immediately after the series of comments cited by Nichols. VRP at 682. Given that the correct

standard was made clear to the jury both before and after the "enforcing a belief" phrase, the State's comments can be fairly seen as argument tied to the proper articulation of the abiding belief standard.[7]

But just as with all of the State's comments during closing arguments, Nichols failed to object. So, here again, even if the State's remarks could be considered improper, a simple curative instruction from the trial court would certainly have clarified that the State's phrasing was not somehow reducing the reasonable doubt burden. *See Emery*, 174 Wn.2d at 760-61. Accordingly, Nichols' prosecutorial misconduct argument fails.

III. CUMULATIVE ERROR

Nichols argues that the cumulative error doctrine warrants reversal of his convictions. We disagree.

The cumulative error doctrine provides that a defendant may be entitled to a new trial when cumulative errors result in a fundamentally unfair trial. *Emery*, 174 Wn.2d at 766. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). The cumulative error doctrine may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). This doctrine does not apply when "the errors are few and have little or no effect on the outcome of the trial." *Id.*

---

[7] A natural extension of Nichols' argument would be that the word "belief" could never be used in a closing argument unless it was always accompanied by the adjective "abiding." Nichols offers no support for such a holding.

Nichols has not demonstrated any error. Therefore, we hold that the cumulative error doctrine is inapplicable.

IV. LEGAL FINANCIAL OBLIGATIONS

Nichols argues that after the trial court found him indigent, his judgment and sentence erroneously imposed the VPA, and therefore, we should remand for the trial court to strike this reference. He also argues that the DNA collection fee should be stricken. The State concedes that the case should be remanded for the trial court to strike the VPA and the DNA collection fee.

We accept the State's concessions. The VPA is no longer authorized for indigent defendants. *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023). Moreover, the DNA collection fee is no longer authorized by statute. *Id.* at 17. Accordingly, we remand to the trial court to strike the VPA and the DNA collection fee.

CONCLUSION

We affirm Nichols' convictions but remand for the trial court to strike the VPA and the DNA collection fee.

No. 58144-2-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

LEE, P.J.

CHE, J.

21